2021 UT App 7

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
EUGENE CHRISTOPHER WRIGHT,
Appellant.

Opinion
No. 20100655-CA
Filed January 22, 2021

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 111903200

Nathalie S. Skibine, Attorneys for Appellant

Sean D. Reyes and Mark C. Field, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1 Eugene Christopher Wright was convicted of murder and aggravated robbery following a ten-day jury trial. The central issue at trial was whether Wright was the man who shot and killed the victim (Victim) in a restaurant parking lot and then fled the scene in Victim's vehicle. Wright argues that he would not have been convicted had the trial court properly excluded the testimony of an eyewitness to the murder. He further argues that his trial attorneys (Counsel) provided constitutionally ineffective assistance based on the way they handled multiple pieces of evidence before and during the trial. We affirm.

BACKGROUND[1]

¶2 Wright was introduced to Victim about two months before the murder. Wright worked for a real estate firm that evaluated commercial bridge loans and was seeking investors for a new project. Wright mentioned this to a friend (Friend) who lived in the same building as Wright in downtown Salt Lake City, and Friend suggested Victim as a potential investor who could make the type of million-dollar loan that Wright was seeking. It was in this capacity that Friend introduced Wright and Victim. And though Wright and Victim met in person at least one time to hash out the terms of the loan, it appears that most of their communication was channeled through Friend. Eventually, Victim agreed to loan Wright two million dollars, which was supposed to be funded two weeks after Victim was murdered.

¶3 The day before the murder, an individual using a prepaid cell phone called Victim twice to arrange the meeting at which he was killed. The first call was placed at 9:03 a.m. and went to Victim's voicemail. The caller left a message (the Voicemail) in which he identified himself as "Robert" and told Victim to call him back. The second call was placed at 9:21 a.m., which Victim answered. Victim's assistant was nearby, and overheard Victim respond to the caller by asking which "Robert" was calling him and then later agreeing to meet the caller at a restaurant in Sandy (the Restaurant) the next morning at 7:00 a.m. When he

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Liti*, 2015 UT App 186, ¶ 3 n.2, 355 P.3d 1078 (cleaned up). "We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Vallejo*, 2019 UT 38, ¶ 2 n.1, 449 P.3d 39 (cleaned up).

hung up the phone, Victim told his assistant that he was excited about the meeting.

¶4    The following morning, Victim received a final call from the prepaid cell phone at approximately 6:31 a.m. and the call was placed from the general location of the Restaurant. Victim was subsequently seen arguing with a man in the Restaurant's parking lot at approximately 7:00 a.m. A witness (Eyewitness) was sitting in his parked car and saw Victim and the man standing by Victim's white Lincoln Navigator while arguing for about three to four minutes. The two then walked directly in front of Eyewitness's vehicle and argued for about ten to fifteen more seconds, and then the man pulled a handgun out of his pocket with his right hand and shot Victim twice. Eyewitness ducked and hid in his vehicle, and the shooter fired the weapon three more times. At this point, several witnesses in the parking lot saw the shooter flee the scene in Victim's vehicle. Eyewitness called the police and relayed the license plate number of the fleeing vehicle.

¶5    Police arrived at the Restaurant just a few minutes later. They were able to take several witness statements and collect physical evidence from the scene. The crucial witness statement was provided by Eyewitness, who relayed a sequential account of what he had observed and provided a detailed description of the shooter. Eyewitness described the shooter's height, weight, build, clothing, and facial characteristics, and noted that the shooter was wearing a wig of long, black hair pulled back into a ponytail.

¶6    Police also recovered two important types of evidence from the scene, the first being five spent bullet casings that were ejected from the shooter's gun. From this evidence, police were quickly able to determine that the shooter used a 9mm handgun. The second key piece of evidence was Victim's cell phone. After looking at Victim's call history and listening to the Voicemail,

police suspected that whoever called Victim on the prepaid cell phone was the shooter.

¶7     Police were able to locate Victim's vehicle several hours later, abandoned on a cemetery's service road just north of the Restaurant. Police impounded the vehicle so that they could test for any physical evidence left by the shooter that might help determine his identity. They eventually found two textured fingerprints on the outside of the driver's door, and another on the inside of the driver's door. They also took numerous DNA samples from various parts of the driver's area, including multiple samples from the steering wheel, gear shaft, door surface/handle, and seat controls. They also collected single samples from the headrest and turn signal assembly.

¶8     Police identified Friend as a possible suspect early on in their investigation. They were aware that Friend was in regular contact with Victim and that Friend owed Victim approximately $1.6 million. This was the amount of money Victim loaned Friend so that he could create a movie about his life, which would focus on Friend's time as an inmate in federal prison on wire fraud convictions. Victim had also paid Friend tens of thousands of dollars based on Friend's apparently false promise that he could secure a sentence reduction for Victim's wife (who was in federal prison for wire fraud) by digging up "dirt" on her ex-husband/former business partner, and then leveraging Friend's alleged connections with a United States senator. Moreover, Victim had spoken with his wife about the 7:00 a.m. meeting the night before he was killed, and she believed that he was meeting with Friend.

¶9     But Friend was ruled out as a possible suspect early in the case based on follow-up investigations. The day after the murder, police showed Eyewitness two photographic lineups that included Friend's photograph along with photographs of other individuals, and Eyewitness did not identify the shooter

from either lineup. The lead investigator (Lead Investigator) also met with Friend in person and concluded that he did not match Eyewitness's description of the shooter, nor did his voice match the voice on the Voicemail. And police had also compared Friend's "historical cell phone data"—the cell phone towers that his phone was connecting to the day before the murder—against the prepaid cell phone's data, and determined that Friend was in a different location than the prepaid cell phone when it was used to set up the 7:00 a.m. meeting. From this, police concluded that Friend could not have been the caller.

¶10    Police eventually determined that Wright was the individual who purchased the prepaid cell phone, which they viewed as a major break in the case. It was initially difficult for police to determine who purchased the prepaid cell phone because, despite quickly determining that it was purchased from an AT&T store, there was no real information in the AT&T records as to who bought it—the name of the purchaser was listed as "someone someone" and also listed a fake email address. But police were able to determine that Wright had purchased the prepaid cell phone by looking at surveillance footage of the store on the day of its purchase. Wright was completely unknown to police investigators prior to learning that he had purchased the prepaid cell phone, but after, they focused their investigation on him.

¶11    Lead Investigator followed this development by showing Eyewitness another photographic lineup, this time with Wright's photograph included among five others. Eyewitness immediately identified Wright as the shooter with eighty to ninety percent confidence, explaining that he could not be one hundred percent confident because the photograph did not allow him to see Wright three-dimensionally. With that said, Eyewitness described in detail how Wright had the same facial features as the shooter. Eyewitness's description of the matching facial features largely focused on details that he provided in his

initial description of the shooter; however, he did emphasize that Wright and the shooter both had blue eyes, which was the first time he had ever mentioned the shooter's eye color to the police.

¶12    Lead Investigator then interviewed Wright at the latter's office to ask if he had any information about Victim that may lead to the identity of the shooter. Wright explained that he knew Victim only through the negotiations of the loan transaction and immediately—without any mention of the prepaid cell phone by Lead Investigator—discussed how he had purchased a prepaid cell phone for Victim. Wright claimed that Victim had asked him to purchase the prepaid cell phone and then give it to him, which Wright did just days after he bought it. Wright explained that he thought this was a strange request, but he agreed to purchase the phone as a small way to endear himself to Victim in an effort to procure the $2 million loan. Lead Investigator thought it suspicious that Wright launched into an unprompted discussion of the prepaid cell phone. He also determined that Wright matched Eyewitness's initial description of the shooter—including his height, weight, and build—and that his voice matched that recorded on the Voicemail.

¶13    Police later executed a search warrant of Wright's condominium, specifically looking for the 9mm handgun used to shoot Victim. They did not find the gun they were looking for, but they did find an empty gun case in Wright's nightstand for a Springfield XD9, a 9mm handgun. Wright never reported his Springfield gun as missing, and he had also bought a new handgun just three days after Victim was murdered. Police seized Wright's gun case and booked it into an evidence locker as "empty Springfield Armory gun" case.

¶14    Wright was arrested shortly after the search warrant was executed. Weeks later, someone at the district attorney's office told Lead Investigator to look inside the gun case because

weapon manufacturers commonly test-fire the weapons before boxing them for sale and leave the spent casing in the gun box. Lead Investigator retrieved the gun box out of the evidence locker and indeed found an envelope left by the manufacturer with a spent casing inside. A ballistics examiner compared this test-fired casing with the casings recovered from the Restaurant and concluded that they were fired from the same weapon.

¶15 Police were also able to take samples of Wright's fingerprints and DNA to compare them against what they lifted from Victim's vehicle. The fingerprints left in and on the vehicle were not Wright's. And after several DNA comparisons, Wright was excluded as being a contributor to the DNA found on the steering wheel. As to the other areas in the vehicle, early tests were "inconclusive" on whether Wright was a possible contributor, meaning that there was not enough information to draw any conclusions as to whether Wright was a contributor or not. However, a later re-test of a comparison between Wright's DNA and DNA lifted from the door led one examiner to conclude that Wright was a "possible contributor."

*Motion to Suppress*

¶16 A few weeks before trial, Wright filed a motion to suppress, seeking to exclude Eyewitness from testifying at trial. The motion seems to have been spurred by new information that was revealed to both the State and Counsel about Eyewitness's independent investigation as to whether Wright was the shooter.

¶17 As described above, Eyewitness's first identification of Wright as the shooter occurred when lead investigator showed him the photographic lineup, in which Eyewitness identified Wright with eighty to ninety percent certainty. But after Wright was arrested and charged, Eyewitness again identified Wright as the shooter, this time with one hundred percent certainty. This second identification occurred at Wright's preliminary hearing,

at which Eyewitness was able to see Wright in person. But between these two identifications, Eyewitness had apparently downloaded a photo of Wright that had been circulated by the media after his arrest. Eyewitness then digitally superimposed various wigs on the photo until he came up with an image that he believed matched the shooter.

¶18   Relying on *State v. Ramirez*, 817 P.2d 774 (Utah 1991), Wright argued in his motion to suppress that Eyewitness's identification was too unreliable to be presented at trial. The focus of Wright's argument was that Eyewitness's photo-recreation experiment demonstrated that his identification of Wright was the product of suggestion. The district court denied Wright's motion, noting that there was no indication that Eyewitness's first identification of Wright was the product of suggestion, and concluding that his identification of Wright was sufficiently reliable under *Ramirez*.

*The Trial*

¶19   At trial, the primary issue for the jury to resolve was whether Wright was the shooter. Key to the State's case was Eyewitness's testimony about what he saw on the day Victim was murdered and identifying Wright as the shooter. But the State also introduced a variety of circumstantial evidence of Wright's guilt.

¶20   To show that Wright placed the calls to Victim on the prepaid cell phone, the State had Lead Investigator and a lay witness familiar with Wright's voice testify that it was Wright's voice on the Voicemail. Additionally, the officer who had initially compared Friend's historical cell phone data against that of the prepaid cell phone testified that he had also compared Wright's cell phone data, and Wright's data was consistent with Wright's cell phone being in the same general location as the prepaid cell phone during the 9:03 and 9:21 a.m. calls. And to

show that Wright's missing 9mm gun was the murder weapon, the ballistics expert who compared the spent casings with the manufacturer test-fired casing testified that all the spent casings were fired from the same weapon. Finally, to show that Wright fled the scene in Victim's vehicle, the State had the examiners who had performed the comparison of Wright's DNA against the DNA found in the car testify as experts. The State attempted to frame the "inconclusive" results in a favorable manner but chiefly relied on the conclusion from one examiner that Wright was a "possible contributor" to DNA found on the driver's door.

¶21 Wright's defense was that Friend was the shooter. Wright pointed out that Friend had both motive and opportunity to kill Victim, and emphasized that even Victim's wife believed Victim met with Friend the morning he was killed. Furthermore, Wright claimed that his Springfield 9mm handgun went missing months before the murder and that Friend easily could have taken it because he had a key to Wright's condominium. He also noted that Friend had finished a massive remodel of his condominium around the time Victim was murdered, yet quickly moved out of the state early in the police's investigation. Wright also argued that most of the circumstantial evidence connecting him to the murder also connected Friend. So the argument went, had police not inexplicably terminated their investigation of the "con man" Friend just days into the case, they would have found that the fingerprints and DNA on and in Victim's vehicle belonged to Friend.

¶22 As to his own innocence, Wright first emphasized that he had no motive to kill Victim nor any opportunity to do so. Indeed, Victim's death prevented the loan from being funded, and Wright's wife testified that she was at home with Wright on the morning of the murder. And to rebut the Voicemail evidence, Wright invited the jurors to compare several recordings of his voice against that on the Voicemail so they could determine for themselves that the voice was not his.

Wright also had an unbiased lay witness familiar with his voice testify that she could not identify his voice on the Voicemail. To rebut the ballistics evidence, multiple lay witnesses testified in support of the theory that Wright could not have used the missing 9mm gun to shoot Victim because that gun was lost months before the murder. And to rebut the DNA evidence possibly placing him in Victim's vehicle, Wright emphasized that he was excluded from having left the fingerprints on and in the vehicle and from being a contributor to the DNA left on the steering wheel. He further argued that the "possible" match on the door handle was based on an unreliable DNA test.

¶23   The trial lasted for ten days, during which the jury heard the testimony of over forty-five witnesses. After hearing all the evidence, the jury convicted Wright of murder and aggravated robbery. The district court sentenced him to fifteen years to life in prison on the murder conviction and five years to life on the aggravated robbery conviction, with the sentences running consecutively.

¶24   Wright appealed and moved to remand under rule 23B of the Utah Rules of Appellate Procedure, alleging his Counsel provided him with ineffective assistance based on the way they investigated and presented the Voicemail and DNA evidence at trial. We granted Wright's motion, and the rule 23B court held a four-day evidentiary hearing. The rule 23B court subsequently entered its findings of fact and ultimate conclusions that Counsel did not provide deficient performance in either respect.

ISSUES AND STANDARDS OF REVIEW

¶25   Wright first contends the district court erred in denying his motion to suppress Eyewitness's identification testimony. "When reviewing a district court's denial of a motion to suppress, the appellate court disturbs the district court's findings of fact only when they are clearly erroneous." *State v. Clark*, 2015

UT App 289, ¶ 12, 363 P.3d 544 (cleaned up). In the past, we have reviewed a district court's decision regarding the reliability of an eyewitness identification for correctness. *See State v. Glasscock*, 2014 UT App 221, ¶¶ 11, 25–26, 336 P.3d 46 (articulating the standard of review of a trial court's analysis of reliability under *State v. Ramirez*, 817 P.2d 774 (Utah 1991)). However, our supreme court recently clarified that for cases to which the new rule 617 of the Utah Rules of Evidence does not apply, a district court's analysis to determine the admissibility of eyewitness identification is rooted in rule 403 of the Utah Rules of Evidence. *See State v. Lujan*, 2020 UT 5, ¶¶ 31, 34–36, 459 P.3d 992. And "[a] trial court's decision to admit evidence under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion." *State v. Kell*, 2002 UT 106, ¶ 29, 61 P.3d 1019; *see also, e.g., State v. Beverly*, 2018 UT 60, ¶ 23, 435 P.3d 160; *State v. Downs*, 2008 UT App 247, ¶ 6, 190 P.3d 17.

¶26   Wright next contends that Counsel provided ineffective assistance based on numerous alleged failures to adequately respond to the State's evidence and closing arguments. For the ineffective assistance claims that were subject to the rule 23B remand, we "defer to the trial court's findings of fact, but review its legal conclusions for correctness." *State v. Wright*, 2013 UT App 142, ¶ 10, 304 P.3d 887 (cleaned up). For Wright's other ineffective assistance claims "raised for the first time on appeal" we "decide whether [he] was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (cleaned up).

ANALYSIS

I. Motion to Suppress

¶27   Wright contends the district court erred in denying his motion to suppress Eyewitness's identification testimony. The district court denied his motion based on its application of the

factors set forth in *State v. Ramirez*, 817 P.2d 774 (Utah 1991). Wright's initial briefing on appeal argues that, under the *Ramirez* factors, Eyewitness's identification of Wright was too unreliable to be admitted at trial.

¶28 But after the initial briefs were filed with this court, Wright's appeal was recalled and stayed by the Utah Supreme Court pending issuance of its opinion in *State v. Lujan*, 2020 UT 5, 459 P.3d 992, which eventually "clarified and reformulated the framework for the analysis of the admissibility of eyewitness identification testimony in Utah." *Id.* ¶ 52. After *Lujan* was issued, the supreme court rescinded its order recalling Wright's appeal, and he subsequently filed a supplemental brief with this court, asking that "[e]ven if this Court concludes that the district court's ruling was correct under the *Ramirez* standard, it should 'remand to the district court to allow it to apply [the] new standards to the facts of this case in the first instance.'" (Quoting *Lujan*, 2020 UT 5, ¶ 8.)

¶29 Based on the foregoing circumstances, a brief explanation of the changing state of the law from *Ramirez* to *Lujan* is warranted. We provide this explanation in subsection I.A. and then address the parties' arguments in subsections I.B. and I.C.

A.   From *Ramirez* to *Lujan*

¶30 In *State v. Ramirez*, 817 P.2d 774 (Utah 1991), our supreme court "br[oke] new ground under the Utah Constitution" by providing "the analytical model to be used by a trial court in determining the admissibility of arguably suggestive eyewitness identifications under article I, section 7, the Utah due process provision." *Id.* at 778, 779. In doing so, the court explained that the analytical model under Utah's due process provision diverged from its federal counterpart because the latter incorporated considerations that were "based on assumptions that are flatly contradicted by well-respected and essentially

unchallenged empirical studies." *Id.* at 780 (cleaned up). The court went on to explain that Utah's model was a "more empirically based approach" that seeks to determine "whether, under the totality of the circumstances, the identification was reliable." *Id.* at 780–81. And to answer this question, the court set forth five general considerations:

> (1) The opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*Id.* at 781 (cleaned up).

¶31    The *Ramirez* court went on to apply these considerations to the facts of that case, which concerned an armed robbery outside of a restaurant at approximately 1:00 a.m. *See id.* at 776. Three victims left the restaurant and were accosted by a mostly masked robber wielding a metal pipe. *See id.* A scuffle ensued, and the assailant struck one of the individuals—the eventual eyewitness—with the pipe and then instructed another masked robber that if the eyewitness moved again, he should shoot him. *See id.* This was the first time the eyewitness had noticed the second robber, who was crouched near the restaurant with a gun in his hand. *See id.* Both assailants fled and the victims called the

police, offering conflicting descriptions of the robbers. *See id.* Ramirez was arrested shortly thereafter when he was walking down a nearby street. *See id.* The police conducted a showup of Ramirez early that same morning by chaining him to a fence and focusing the headlights of their vehicles on him while the three victims observed this from the back of a squad car. *See id.* at 777. Two of the victims could not identify Ramirez as either robber, but the eyewitness identified him as the gunman. *See id.*

¶32   The *Ramirez* court noted that it was "an extremely close case" given that "none of the witnesses . . . ever saw the full face of the gunman," "[t]he differences in racial characteristics between [the eyewitness] and Ramirez, and "[t]he blatant suggestiveness of the showup." *Id.* at 784. But because the trial court "was persuaded that [the eyewitness] observed the gunman closely enough, including his eyes and clothing, to identify him less than an hour after the robbery," the court held that "admitting the identification [was not a] violation of Ramirez's right to due process of law under article I, section 7 of the Utah Constitution." *Id.*

¶33   For decades, the *Ramirez* due process framework was interpreted by lower courts as the threshold test for evaluating the admissibility of eyewitness identification testimony. *See, e.g., State v. Reyos*, 2018 UT App 134, ¶ 17, 427 P.3d 1203; *State v. Gallegos*, 2016 UT App 172, ¶ 40, 380 P.3d 44; *State v. Guzman*, 2004 UT App 211, ¶ 18, 95 P.3d 302. And a common feature emerged in conducting the *Ramirez* analysis—comparing the identification at issue with the identification countenanced in *Ramirez*—which often resulted in admission of the identification. *See, e.g., State v. Glasscock*, 2014 UT App 221, ¶ 27, 336 P.3d 46 ("The circumstances surrounding [v]ictim's identification of [the defendant] are far less troubling than those in [*Ramirez*]."). In *State v. Lujan*, 2015 UT App 199, 357 P.3d 20, we expressed concern over this "disconnect between the legal analysis in *Ramirez* and its outcome" and called on our supreme court to

revisit the *Ramirez* framework in light of scientific and legal research so that it would "accurately reflect the changed views about handling" eyewitness identification testimony. *See id.* ¶ 10 n.1. In response, our supreme court granted certiorari.[2]

¶34    In *State v. Lujan*, 2020 UT 5, 459 P.3d 992, our supreme court clarified that the admissibility of eyewitness identification testimony "is to be measured in the first instance by our rules of evidence" rather than by any due process standard. *Id.* ¶ 57. The supreme court explained that the *Ramirez* factors were "rooted in evolving social science and legal scholarship" and that these types of considerations are not an appropriate "basis for establishing fixed principles of constitutional law." *Id.* ¶ 28. Instead, they are more appropriately addressed by our rules of evidence because these rules are "subject to nimble reformulation and revision in response to changes in prevailing scientific and legal scholarship." *Id.* ¶ 29.

¶35    The supreme court went on to note that "our rulemaking process ha[d] in fact fulfilled this task" because rule 617 of the Utah Rules of Evidence was promulgated while *Lujan* was under advisement. *Id.* ¶ 30. Rule 617 "establishes factors and standards for a trial court to employ in judging the admissibility of eyewitness testimony" based on "recent scholarship in social science journals and law journals." *Id.* And while rule 617 "was not in place at the time of the trial" and thus "could not have been applied in the disposition" of the case, the supreme court held that the district court and court of appeals "could and should have" applied rule 403 of the Utah Rules of Evidence in assessing "the admissibility of the eyewitness identification testimony." *Id.* ¶ 31; *see also id.* ¶¶ 35–36.

---

2. Any further references we make to "*Lujan*," if not otherwise specified, refers to our supreme court's opinion in *State v. Lujan*, 2020 UT 5, 459 P.3d 992.

¶36 Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. The supreme court explained that "important research has identified both 'estimator variables' and 'system variables' that may tend to undermine the reliability of a given eyewitness account," and these variables "may be considered in assessing both the probative value of a given piece of eyewitness identification testimony and the possibility of it producing unfair prejudice." *Lujan*, 2020 UT 5, ¶ 36 (cleaned up). And the supreme court provided an exemplary list of these variables:

> Estimator variables are factors connected to the event, witness, or perpetrator—items over which the justice system has no control. These are factors that may affect the reliability of an eyewitness account. They include (among others) the viewing conditions at the time of the event (distance, lighting, etc.), the amount of stress (or duress) the witness was under, whether there was a weapon that the witness focused on, witness characteristics (age, impairment, etc.), perpetrator characteristics (like age and race, given that witnesses are better at identifying persons of their own age and race), and factors affecting memory decay.
>
> System variables consist of factors controlled by the court or law enforcement. Examples of system variables that may affect the reliability of an eyewitness account are the use of double-blind identification procedures, the quality of pre-identification instructions, and the use of proper lineup construction.

*Id.* ¶¶ 37–38 (cleaned up).

¶37 Acknowledging that it had "clarified and reformulated the framework for the analysis of the admissibility of eyewitness identification testimony," *id.* ¶ 52, the supreme court stated it "might, in an ordinary case, be inclined to remand to the district court to allow it to apply our new standards to the facts of this case in the first instance," *id.* ¶ 8.[3] But it saw no need to remand because "any arguable error in admitting the eyewitness identification evidence . . . was harmless in light of the other evidence in the record establishing [the defendant's] guilt." *Id.*

---

3. *Lujan* never specifically articulates which new standards the district court would be obliged to apply had it remanded the case. But we think the opinion otherwise makes clear that the district court would have been required to apply rule 403 only, given that rule 617 was not in effect at the time of trial. *See State v. Clopten*, 2009 UT 84, ¶ 37, 223 P.3d 1103 (recognizing that the district court's decision to exclude expert testimony must be reviewed in light of the rules of evidence in effect at the time of trial). We acknowledge that *Lujan* sometimes speaks, in plural terms, of the *rules* that the district court "could and should have . . . applied." *See Lujan*, 2020 UT 5, ¶ 31. But *Lujan* never identifies any specific rule of evidence that "could and should" have been applied other than rule 403. *See id.* ¶¶ 31, 34–36. Indeed, aside from rule 617, rule 403 is the only rule mentioned after the court's specific directive that it would, "[i]n the paragraphs below[,] . . . highlight the standards in our rules of evidence (both at the time of trial and under newly adopted rule 617) that should have formed the basis for the threshold inquiry into the admissibility of the eyewitness testimony in this case." *See id.* ¶¶ 33–45. And aside from rule 403, we are unable to divine any rules of evidence in existence at the time of trial that otherwise informed the determination of whether eyewitness testimony is admissible. Perhaps more importantly, neither party on appeal has argued that any rule besides rule 403 is in play.

¶38 With the foregoing history of the standard for assessing the admissibility of eyewitness identification testimony from *Ramirez* to *Lujan* in mind, we move on to address the parties' arguments. We first address how *Lujan* impacts our review of the district court's order. We next evaluate whether the district court abused its discretion in concluding that Eyewitness's testimony was sufficiently reliable and, consequently, admissible.[4]

B.      Impact of *Lujan* on this Case

¶39 Wright maintains that we should still review the district court's determination that Eyewitness's testimony was admissible under *Ramirez* and reverse if we find that a proper application of *Ramirez* should have led to exclusion. He argues that only if we find that the district court properly applied *Ramirez* should we then "remand to the district court to" conduct a rule 403 analysis. (Quoting *Lujan*, 2020 UT 5, ¶ 8.) On the other hand, the State argues that neither course of action suggested by Wright is necessary because any error in admitting Eyewitness's testimony was "harmless beyond a reasonable doubt in light of"

---

4. In its initial brief filed with this court, the State argued that we should clarify the admissibility of eyewitness identification testimony under Utah's due process standard by interpreting it in line with the federal due process standard, which requires a threshold showing of police suggestiveness. The State apparently argued the same to the supreme court in *Lujan*, but the court declined to take up the issue because police suggestiveness was conceded in that case. In its supplemental brief, the State appears to have withdrawn its request that we reformulate the law.

the other evidence introduced at trial.[5] (Quoting *Lujan*, 2020 UT 5, ¶ 32.) But the State agrees that if *Lujan* mandates a remand in this case, it would only be for the district court to conduct a rule 403 inquiry.

¶40    We reject Wright's invitation to review whether the district court's admissibility determination ran afoul of *Ramirez*. We acknowledge that the *Ramirez* framework was the analytical model explicitly argued by the parties in the motion to suppress and consequently applied by the district court in its determination that Eyewitness's testimony was admissible. But *Lujan* instructs that, even when the motion to suppress was argued and ruled on in 2010, "the threshold standard of admissibility of eyewitness testimony" was provided by our rules of evidence—specifically rule 403, the only applicable rule of evidence identified by the *Lujan* court in existence at that time. *See Lujan*, 2020 UT 5, ¶¶ 34–36, 46. And while the *Ramirez* factors did provide "guidance" in "assessing whether evidence produced *as a result of suggestive police activity* should be excluded on the ground that it leads to a substantial likelihood of misidentification," they were not a "freestanding standard of evidentiary admissibility." *See id.* ¶¶ 23, 49 (emphasis added).[6]

---

5. We simply note that we disagree with the State's assessment that Eyewitness's testimony was harmless.

6. There was no allegation of suggestive police procedures raised before the district court. Wright argues on appeal that the photographic lineup used to identify him was the product of suggestive police procedures—which we will not consider. *See State v. Gonzalez*, 2015 UT 10, ¶ 24, 345 P.3d 1168 (discussing that grounds not raised in a motion are generally dismissed by appellate courts for lack of preservation). We reject Wright's implicit assertion that the district court was required to sua sponte address the issues he waited to raise until now—such as

(continued…)

The dispositive question before the district court was whether the eyewitness identification was admissible—or in the parlance of rule 403—whether the probative value of Eyewitness's testimony was "substantially outweighed by a danger" of "unfair prejudice." Utah R. Evid. 403; *see also Lujan*, 2020 UT 5, ¶ 51 ("It seems likely that whenever there is a substantial likelihood of misidentification under the due process framework there will also be a basis for exclusion under our rules of evidence." (cleaned up)).

¶41   Consequently, our review is limited to determining whether the district court abused its discretion under rule 403 in admitting Eyewitness's testimony.[7] And the fact that the district

_____

(…continued)
whether the lineup complied with National Institute of Justice Guidelines—because it "t[ook] up the question" of suggestion by applying the *Ramirez* factors. *See Patterson v. Patterson*, 2011 UT 68, ¶ 17, 266 P.3d 828 ("[T]he Utah Court of Appeals ha[s] on countless occasions exercised [its] discretion to refuse to consider new issues, arguments, claims, or matters on appeal."); *Federated Cap. Corp. v. Deutsch*, 2018 UT App 118, ¶ 19, 428 P.3d 51 ("It generally would be unfair to reverse a district court for a reason presented first on appeal." (cleaned up)).

7. The original briefing in this case filed prior to *Lujan* focused on whether the district court erred by admitting Eyewitness's testimony under *Ramirez*. A review under *Ramirez* without the clarification of *Lujan* would also lead to affirmance. As the district court's findings demonstrate, and we agree, "[t]he circumstances surrounding [Eyewitness's] identification of [Wright] are far less troubling than those in [*Ramirez*]." *See State v. Glasscock*, 2014 UT App 221, ¶ 27, 336 P.3d 46. We also note that, aside from initially framing the argument under the *Ramirez* framework, Wright never invokes an independent due
(continued…)

court evaluated the admissibility of Eyewitness's testimony through explicit reference to the *Ramirez* factors does not, in and of itself, necessitate either reversal or remand. For one thing, "scrupulous examination under rule 403 . . . can be inferred when the trial court has heard arguments on the relevant issues and has made sufficient inquiry, even if that inquiry was not expressly identified by the court." *See State v. Lomu*, 2014 UT App 41, ¶ 34, 321 P.3d 243 (cleaned up) (referencing the now defunct *Shickles* and *Verde* factors). And more fundamentally, "appellate review of evidentiary decisions" should only "assess whether the district judge made an error *in admitting or excluding the evidence in question*" and should thus affirm so long as the trial court made the "right decision," even if it was for "a mistaken reason." *See State v. Thornton*, 2017 UT 9, ¶¶ 51, 53, 391 P.3d 1016.

¶42 With that said, it is important to note that there are appreciable similarities between a rule 403 analysis and the *Ramirez* framework. Applying rule 403 to an eyewitness identification invites a district court to "tak[e] account of both . . . 'estimator variables' and 'system variables'" to "assess whether such variables have undermined the reliability of a given eyewitness account." *See Lujan*, 2020 UT 5, ¶¶ 34–38, 41, 44. This is because the reliability of an eyewitness account determines both its probative value and the possibility that its admission into evidence will result in unfair prejudice. A reliable identification has a high probative value because there is a likelihood that the identification is accurate. But an unreliable identification presents a much weaker, or in some cases

---

(…continued)

process argument. *See Lujan*, 2020 UT 5, ¶ 51 (explaining that conducting the required inquiry under the rules of evidence should obviate the need to conduct a separate constitutional inquiry "in the run of cases").

nonexistent, likelihood and may nevertheless be perceived by the jury as nearly irrefutable evidence of the defendant's involvement in the crime:

> [Eyewitness testimony] is sometimes viewed as the gold standard. It is tempting to say that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says "That's the one!" But some eyewitness accounts are fool's gold. An eyewitness who is affected by significant estimator or system variables may appear to present a highly probative account of the crime; but false appearance of probity may ultimately translate into unfair prejudice.

*Id.* ¶ 41 (cleaned up). Under *Lujan*, the district court should have evaluated various factors, including whether the viewing conditions at the time of the observation allowed for a reliable identification, before weighing the probative value against the danger of unfair prejudice under rule 403. The analysis under the *Ramirez* framework is quite similar, as it is itself a lengthy evaluation of estimator and system variables that is explicitly geared toward "determining the reliability of the identification." *Ramirez*, 817 P.2d at 782; *see also id.* at 779 (noting that the need for courts to serve as the gatekeeper to the admissibility of eyewitness testimony is "particularly serious . . . because of the probability that such evidence[,] even [if] thoroughly discredited[,] has a powerful effect on a jury"). Indeed, *Lujan* directly acknowledges the overlap between the *Ramirez* and rule 403 analyses, noting that *Ramirez*'s estimator and system variables encompass many of the factors that could be considered in the rule 403 framework. *See Lujan*, 2020 UT 5, ¶ 51.

¶43 With the foregoing similarities in mind, on the record before us—particularly the district court's twenty-page order

addressing the reliability of Eyewitness's testimony—we can determine that the district court evaluated the relevant reliability factors and thus substantively made a rule 403 inquiry, even if it never *explicitly* invoked the rule. *See Lomu*, 2014 UT App 41, ¶ 34. As will be more fully discussed below, the district court evaluated each and every estimator and system variable specifically delineated in *Lujan* as "crucial" to the rule 403 inquiry. *See Lujan*, 2020 UT 5, ¶¶ 36–37, 41. We thus reject Wright's assertion that we must remand for the district court to apply rule 403, as doing so would only elevate form over substance. And we accordingly proceed by evaluating whether the district court abused its discretion in admitting Eyewitness's testimony.

C.      Reviewing the District Court's Decision

¶44     Wright argues that the district court incorrectly found that various factual circumstances supported a determination that Eyewitness's identification was sufficiently reliable. Wright asserts that Eyewitness had little opportunity to see the shooter, that he was focused on the shooter's wig, and that he provided inconsistent details about the shooter as time progressed—particularly with regard to the shooter's eye color and facial hair. But as he did in arguing the motion to suppress to the district court, Wright particularly emphasizes that Eyewitness's exposure to Wright's booking photo and subsequent photo-recreation cast doubt on the reliability of his identification.

¶45     First, the district court evaluated whether Eyewitness had a sufficient opportunity to view the shooter. It found that Eyewitness observed the shooter and Victim for about three to four minutes before the shooting and then observed them as close as six to seven feet in front of his vehicle for another ten to fifteen seconds, during which he saw both profiles of the

shooter's face and that it was light outside,[8] with no distracting noises, activity, or other circumstances affecting Eyewitness's opportunity to observe the shooter. The district court thus evaluated the "viewing conditions at the time of the event (distance, lighting, etc.)," and resolved that these estimator variables supported a finding of reliability. *See Lujan*, 2020 UT 5, ¶ 37.

¶46     Second, the district court evaluated whether Eyewitness's attention was focused on the shooter. It emphasized that, despite Eyewitness's own statements indicating that the shooter's wig stood out to him, he was able to provide a number of details about the shooter's height, weight, build, facial structure, facial features, and clothing on the day of the shooting—and that his ability to do so demonstrated that his attention was focused on the shooter. The district court also made several findings about Eyewitness's observations of the shooter's gun and appeared to agree with the State that Eyewitness had sufficient opportunity to view and make a number of observations about the shooter before the gun was ever drawn. The district court thus evaluated whether there was a "weapon that the witness focused on," and resolved that Eyewitness's attention was sufficiently focused on the shooter to provide a reliable identification. *See Lujan*, 2020 UT 5, ¶ 37.

---

8. Wright appears to implicitly argue that this finding was clearly erroneous based solely on conflicting *trial* testimony. We do not consider this argument or any others in which Wright attempts to show that that the district court's findings of facts are clearly erroneous by directing us only to trial testimony. The district court's findings cannot be "against the clear weight of the evidence," *Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶ 14, 469 P.3d 1035, when the only contrary evidence was not presented until after the pre-trial motion was argued and ruled on.

¶47   Third, the district court evaluated whether Eyewitness had sufficient capacity to observe the event. The district court found that, for the bulk of Eyewitness's observation of the shooter, he was witnessing only a verbal altercation from the safety of his own car. It thus resolved that Eyewitness's capacity to observe the shooter was not impaired by stress or fright because, despite witnessing the eventual shooting, he still had the wherewithal to immediately call the police when the shooting stopped and memorize the license plate number of the fleeing vehicle. The district court also found that there was nothing to suggest Eyewitness's "capacity to observe was hindered by personal motivations, biases, or prejudices, or by uncorrected visual defects, or by fatigue, injury, drugs, or alcohol." The district court thus evaluated both "the amount of stress (or duress) the witness was under," and "witness characteristics (age, impairment, etc.)," and determined that neither had any appreciable impact on Eyewitness's capacity to observe the shooter. *See Lujan*, 2020 UT 5, ¶ 37.

¶48   Fourth, the district court evaluated whether Eyewitness's identification was sufficiently spontaneous and remained consistent, or was instead the product of suggestion. The district court found that the "core of [Eyewitness's] identification was made spontaneously" on the day of the murder and "remained consistent thereafter":

> The eyewitness described the shooter as over six feet tall, wearing a tan suede jacket, medium build, thick brown hair pulled back into a pony tail and it looked like a wig. The eyewitness described the shooter's face as elongated with a point noise, buggy eyes, and distinct jaw.

It did note that "each time [Eyewitness] gave a description of the shooting incident and the shooter, there were additional facts about the shooter" such as the shooter possibly speaking with an

Eastern European accent, having bright blue eyes, and having a long mustache that hung all the way to his chin, and that the wig consisted of black rather than dark brown hair. But the district court found that these additions did not negate that Eyewitness's description was largely consistent and that it was reasonably likely that Eyewitness's recall of additional facts was the product of being asked different questions that prompted different answers. The district court also noted that Eyewitness's exposure to information from outside sources came from the media's circulation of Wright's booking photo and Eyewitness's subsequent photo-recreation experiment but explained that this all occurred "after the identification" of Wright in the "photo-lineup with 80–90% accuracy," and thus there was no evidence that this identification was the product of suggestion. The district court therefore evaluated factors relevant to "memory decay" and resolved that the details Eyewitness was able to provide on the day of the shooting and consistently recall thereafter demonstrated that his eventual identification of Wright in the photo-lineup was not tainted by memory decay. *See Lujan*, 2020 UT 5, ¶ 37.[9]

¶49    Fifth, the district court evaluated whether the nature of the event Eyewitness observed presented a likelihood that he would perceive, remember and relate it correctly. The district court found that, because it was not ordinary for Eyewitness to observe an argument escalating to murder, the nature of the event made it highly likely that Eyewitness would correctly

---

9. The district court's evaluation of system variables was necessarily brief because Wright never argued that the police utilized any suggestive procedures, but it nevertheless explained that the presence of suggestive procedures was relevant to its evaluation. The district court went on to conclude that there was no indication of suggestive police procedures that would otherwise weigh against admission of Eyewitness's testimony.

perceive, remember, and relate his observations. It further found that Eyewitness and the shooter were the same race, and that this circumstance further increased the likelihood that he would correctly perceive and relate his observations. The district court thus again evaluated "factors affecting memory decay" as well as "perpetrator characteristics," and resolved that neither supported a finding that Eyewitness's observation was unreliable. *See Lujan*, 2020 UT 5, ¶ 37.

¶50    The district court then synthesized these findings and found that Eyewitness's identification was sufficiently reliable to allow him to testify at trial. It stated that "[a]lthough there [we]re some contradictions in [Eyewitness's] opinion and identification," the district court was "persuaded that [Eyewitness] observed the shooter closely enough to identify him less than five weeks after the shooting" in the photographic lineup. This analysis was tantamount to the district court finding that Eyewitness's identification was highly probative because it was not negatively impacted by estimator or system variables in any significant way. Correspondingly, the trial court's consideration of each factor and the totality of the circumstances extensively and effectively weighed any unfair prejudice and whether that prejudice would substantially outweigh its probative value—resolving that the few contradictions in Eyewitness's identifications did not present an appreciable risk of a "false appearance of probity [to] ultimately translate into unfair prejudice." *See Lujan*, 2020 UT 5, ¶ 41.

¶51    The foregoing makes clear that the district court did weigh the probative value of Eyewitness's testimony against any unfair prejudice, and its analysis was guided by the specific estimator and system variables referenced in *Lujan* as "crucial" to a rule 403 determination. *See id.* And we see no abuse of discretion in the district court's conclusion that Eyewitness's testimony was admissible based on its evaluation of the foregoing variables. To the extent that they are preserved,

Wright's arguments amount to asserting that the district court should have given more or less emphasis to certain facts, and do not come anywhere close to demonstrating that the district court's decision was "beyond the limits of reasonability." *See State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (cleaned up). We thus decline to disturb Wright's convictions based on the admission of Eyewitness's testimony at trial.

## II. Ineffective Assistance of Counsel

¶52 Wright contends that Counsel provided ineffective assistance in a number of instances. To prevail on a claim of ineffective assistance of counsel, the defendant must show that "(1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (cleaned up). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Hatch*, 2019 UT App 203, ¶ 29, 455 P.3d 1103 (cleaned up).

¶53 To demonstrate that counsel performed deficiently, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Ray*, 2020 UT 12, ¶ 34 (cleaned up). As a result, it is not enough for the defendant to simply point to "some strategy other than the one that counsel employed [that] looks superior given the actual results of trial." *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (cleaned up). And "decisions as to what witnesses to call, what objections to make, and by and large, what defenses to interpose, are generally left to the professional judgment of counsel." *State v. Curtis*, 2013 UT App 287, ¶ 33, 317 P.3d 968 (cleaned up). It follows that "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *Ray*, 2020 UT 12, ¶ 34. But "even

where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. Instead, "[a] reviewing court must always base its deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness." *Ray*, 2020 UT 12, ¶ 36.

¶54    Counsel's performance is prejudicial if the defendant can demonstrate that there is "a reasonable probability that the outcome of his or her case would have been different absent counsel's error." *Scott*, 2020 UT 13, ¶ 43. Accordingly, the defendant must do more than simply "show that the errors had some conceivable effect on the outcome of the proceeding." *State v. Gallegos*, 2020 UT 19, ¶ 64, 463 P.3d 641 (cleaned up). Instead, the defendant must demonstrate that "the likelihood of a different result . . . [is] substantial." *Id.* (cleaned up).

A.    Ballistics Evidence

¶55    Wright first argues that Counsel performed deficiently with regard to the State's use of ballistics evidence presented through an expert witness. Wright argues that we can infer Counsel failed to investigate the ballistics evidence because "[a] cursory Google/Westlaw search would have revealed that a debate was raging about the reliability and admissibility of this evidence" due to its purported reliance on the subjective assessments of the examiner. Wright argues that we can make this inference because Counsel failed to use this readily available information to cross-examine the expert or otherwise move to exclude his testimony.

¶56    The State's ballistics expert testified as to his examination of the six bullet casings recovered by the police. He testified that he analyzed these casings using a method called "toolmark identification," which is based on the premise that the barrel of a

gun has microscopic irregularities unique to the weapon that will leave corresponding unique marks on the bullet casings fired from the weapon. When asked by the State whether he was "confident that all six cartridge casings were shot from the same firearm," the ballistics expert responded that he was.

¶57    Wright asks us to infer that Counsel failed to investigate the ballistics evidence, positing that this is "[t]he only explanation" for Counsel's failure to challenge the reliability of toolmark identification. But "[w]here the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of a finding that counsel performed effectively." *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. Wright's failure to point to anything in the record to substantiate what Counsel failed to do thus requires us to "presume that [they] did what [they] should have done." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (cleaned up). Moreover, the record affirmatively demonstrates that Counsel did investigate the evidence—the rule 23B court found that Counsel had spoken with at least two firearms experts.

¶58    To the extent that Wright's argument can be construed as a broader assertion that Counsel's treatment of the evidence was nevertheless unreasonable, we are not persuaded. For one thing, Counsel could have reasonably believed that cross-examining the ballistics expert about how toolmark identification "relies on the individual examiner's training and experience," *United States v. Monteiro*, 407 F. Supp. 2d 351, 371 (D. Mass. 2006), would have bolstered the ballistics expert's credibility with jurors, given that the expert had decades' worth of experience conducting thousands of toolmark identifications, was extremely accomplished in his field, and had even published numerous

articles on how to respond to legal challenges to toolmark identification's methodology.[10]

¶59 And although Counsel's cross examination of the ballistics expert was brief, the evidence did not go unaddressed. Instead, Counsel called numerous lay witnesses who testified that the last time Wright possessed the gun was months before the murder, when he placed the gun next to the front door of his condominium after a shooting trip with friends. And Counsel successfully introduced photographic evidence to corroborate Wright's version of events that the gun went missing shortly thereafter. Counsel also elicited testimony that Friend had access

---

10. Nor do we think Counsel's decision not to challenge the admissibility of the expert's testimony under rule 702 of the Utah Rules of Evidence was objectively unreasonable. Indeed, the very cases that Wright suggests should have been utilized in making these motions would have led Counsel to reasonably conclude that the motions would have been futile. *State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (cleaned up)). These cases recognize that if there was any "sweeping national trend," it was toward admitting toolmark identification testimony. *See, e.g., United States v. Willock*, 696 F. Supp. 2d 536, 546 (D. Md. 2010) (denying a motion to suppress toolmark identification testimony because such a ruling was "consistent with every reported federal decision to have addressed the admissibility of toolmark identification evidence"); *United States v. Green*, 405 F. Supp. 2d 104, 123 (D. Mass. 2005) ("State courts have similarly rejected *Daubert*-type challenges to ballistics testimony. . . . [P]recedent plainly points *in favor* of admissibility."). And Counsel's belief in this regard would have been all the more reasonable with specific reference to the State's ballistics expert, given his particular credentials.

to Wright's condominium during this timeframe, and even had a key to it by virtue of his position as president of the building's homeowner's association.

¶60    Through this lay testimony and photographic evidence, Counsel laid the groundwork to undermine the inference that the ballistics evidence was designed to raise—that if Wright's gun was the murder weapon, he must be the shooter—arguing that Wright could not have shot Victim with a gun that he lost months before the shooting. And this evidence also suggested that Friend *could* have used Wright's gun to commit the murder, by permitting an inference that the reason Wright's gun went missing was because Friend entered Wright's condominium and took it. Given that the core theory of Wright's defense was that Friend was the shooter, Counsel's choice to address the ballistics evidence this way was not objectively unreasonable. *See State v. Vallejo*, 2019 UT 38, ¶ 70, 449 P.3d 39 (holding that counsel was not ineffective for failing to object to an adverse witness testifying, given that counsel used the witness to highlight inconsistencies in a manner that furthered the core theory of the defense, and was thus a "reasonable tactical" decision).

¶61    Based on the foregoing, we conclude that Counsel did not perform deficiently with respect to the ballistics evidence presented by the State. Because Wright cannot show the first element of this ineffective assistance claim, we reject it.

B.      Historical Cell Phone Data Evidence

¶62    Wright next argues that Counsel performed deficiently with regard to the State's historical cell phone data evidence. This evidence was presented through an expert witness who concluded that the prepaid cell phone and Wright's cell phone were operating from the same geographic areas the day before the murder. Wright argues that, had Counsel adequately investigated the evidence, they would have sought to exclude

the State's expert from testifying and would have cross-examined him differently.

¶63    The State's expert testified about his examination of the respective cell phone towers that the prepaid cell phone, Wright's cell phone, and Friend's cell phone were connecting to on the day before the murder. He explained that because cell phones constantly connect to the tower with the strongest signal, determining which tower a cell phone was connecting to at a given time can allow investigators to determine a general geographic location of the phone. More specifically, he explained that the strength of a signal is a product of both geographic proximity and "line of sight," such that phones "usually connect[] to the [tower] that's [in the] closest line of sight"—in other words, if a cell phone is relatively close to two towers, but one tower is obstructed by a building, the phone will connect to the unobstructed tower. Because all three cell phones were registered to different cell phone providers, and in turn connected to different cell phone towers, the expert's conclusions were based on a comparison of the proximity of the various connections at issue.

¶64    The expert testified that when the prepaid cell phone made the 9:03 a.m. call to Victim, it was connecting to a tower at 400 South West Temple—about halfway between Wright's downtown condominium (approximately 300 South 200 West) and office (approximately 400 South Main St.). He further testified that Wright's cell phone made two calls that morning at 8:57 a.m. and 9:39 a.m., and both connected to another tower about halfway between his home and office. However, he testified that when the 9:21 a.m. call was made from the prepaid cell phone to Victim, it connected to a tower farther east, at approximately 400 South 400 East. Nevertheless, the expert still concluded that it was highly likely that Wright's phone and the prepaid cell phone were in the same location, explaining that the 9:21 a.m. call could still have been placed from Wright's office

because—save for a single two-story building in the way—there was a fairly clear line of sight between Wright's office and the tower at 400 South 400 East. The expert also thought the prepaid cell phone location was more consistent with Wright's location than Friend's location, because the latter's cell phone connected to a tower at 850 South 500 West that morning.

¶65 Counsel responded by emphasizing that the expert's method purports to provide only a general geographic placement of a phone, and that this method was ill-suited for determining the respective locations of two people who lived in the same building and both worked downtown. And Counsel noted that while the expert's methodology relied on the premise that cell phones generally connect to the closest cell tower in the line of sight, the expert had apparently failed to adequately investigate the relevant areas downtown to determine accurate lines of sight. To this point, Counsel explained that the expert was wrong about his crucial assumption that there was a clear line of sight between Wright's office and the tower at 400 South 400 East. Counsel demonstrated that Wright's office was on the ground floor, there were multiple high-rise buildings in the way, and there were several other obstructions along 400 South. Counsel also elicited that the expert completely failed to investigate the lines of sight between Friend's condominium and the 850 South 500 West tower relative to other towers closer to the prepaid cell phone.

¶66 Wright again asks us to infer that Counsel failed to investigate the historical cell phone data evidence by asserting that informed counsel would have utilized the "available information" on the inherent limitations of the expert's methodology to exclude him from testifying altogether or, at the least, would have cross-examined him about those limitations. As before, we are precluded from inferring that Counsel failed to investigate the evidence based on ambiguities in the record. Instead we "presume that [they] did what [they] should have

done." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (cleaned up).

¶67 Nor do we find that Counsel's treatment of the evidence was otherwise objectively unreasonable because we discern reasonable strategic explanations. As an initial matter, Counsel could have reasonably believed that the expert's conclusions were not supported by his own methodology, given his inaccurate (or otherwise lacking) line of sight determinations, and thus that there was no need to also attack the validity of methodology. *See McCloud v. State*, 2019 UT App 35, ¶ 48, 440 P.3d 775, *cert. granted*, 455 P.3d 1058 (Utah 2019) (noting that competent attorneys can make strategic choices to avoid shifting the jury's attention to matters of esoteric forensic science).

¶68 And in a trial in which there was no genuine dispute that Wright purchased the prepaid cell phone, Counsel could have reasonably believed that any harm in further linking Wright to the prepaid cell phone was outweighed by the benefit to be gained from the State's own experts further linking Friend to the prepaid cell phone. After all, Friend's cell phone connected to a tower just blocks away from the prepaid cell phone's tower. Moreover, given that Lead Investigator's early decision that Friend was not a viable suspect was partially based on the expert's purported examination of Friend's cell phone activity relative to the prepaid cell phone, allowing the expert to testify and highlight his faulty investigation into the lines of sight furthered the defense theory about the police's failure to adequately investigate Friend as a suspect.

¶69 In light of our determination that Counsel did not perform deficiently, we need not evaluate whether Wright was prejudiced by Counsel's performance. Nevertheless, we are not persuaded that, even if Counsel successfully moved to preclude all the historical cell phone evidence, there is a substantial likelihood that Wright would not have been convicted. Given the

apparent concession that Wright bought the prepaid cell phone, the jury could have reasonably inferred that Wright possessed and used the prepaid cell phone to arrange the 7:00 a.m. meeting based on this fact alone.

¶70 Accordingly, Wright has failed to demonstrate either deficient performance or prejudice stemming from Counsel's treatment of the historical cell phone data evidence. As a result, we reject this ineffective assistance claim.

C. DNA Evidence

¶71 Wright next argues that Counsel performed ineffectively by failing to consult with an expert about the State's DNA evidence. Wright argues that Counsel failed to understand and convey to the jury that the DNA evidence was largely favorable to Wright's defense, and that Counsel would have been apprised of the favorable nature of the DNA results had they consulted with DNA experts.

¶72 Wright's claim regarding the DNA evidence was one issue remanded under rule 23B of the Utah Rules of Appellate Procedure. The rule 23B court rejected Wright's arguments and determined that Counsel did not perform deficiently. Wright asserts that the rule 23B court "correctly concluded [C]ounsel failed to investigate or present evidence from a DNA expert but incorrectly concluded the failure to investigate was a 'legitimate strategic choice.'"[11] He adds that "Counsel cannot make 'a

---

11. At the rule 23B remand, Wright argued that Counsel performed deficiently in not having an expert testify, and there are some suggestions made in this regard in Wright's appellate brief. The rule 23B court found that Counsel's decision to present the favorable DNA evidence through the State's experts and cross-examination was a reasonable tactical decision because it

(continued…)

legitimate strategic choice' not to investigate," and frames the rule 23B court's conclusion as being "premised on the idea [C]ounsel could—without investigation—strategically not investigate."

¶73 Wright simply mischaracterizes the rule 23B court's findings and conclusion. To start, the rule 23B court never found that Counsel failed to investigate the DNA evidence. Quite to the contrary, the rule 23B court made several specific findings as to the investigatory steps taken by Counsel—they reviewed the DNA results, did their own independent research, and spoke with the State's DNA experts about the test results. The rule 23B court also found that Counsel had previously "dealt with DNA experts, questioned them, learned the science, and gone to the State Crime Lab." And based on Counsel's investigatory steps and their familiarity with DNA evidence, the rule 23B court further found that they "knew the DNA test results were favorable," particularly the "test results from the steering wheel," and that the one result in which Wright was a "possible contributor" was from a degraded sample that could easily be explained. Wright fails to challenge any of these factual findings, all of which establish that counsel investigated the DNA evidence. The rule 23B court then concluded that Counsel made a reasonable choice not to include consulting with an independent expert as part of their investigation into the evidence. This was based on the rule 23B court's findings that consultation with an expert would not have "materially aided [C]ounsel in understanding or presenting to the jury the favorable nature of the DNA results," given their own

---

(…continued)
allowed Wright to argue that the State's own experts supported his defense. Wright does not specifically challenge this conclusion or the related findings in his brief, and we agree with the rule 23B court's determination.

independent investigation and existing familiarity with DNA evidence.

¶74 We agree with the rule 23B court that—based on the unchallenged findings—Counsel's decision not to consult with an independent expert was reasonable. *See McCloud v. State*, 2019 UT App 35, ¶ 64, 440 P.3d 775, *cert. granted*, 455 P.3d 1058 (Utah 2019) ("Based on various legitimate considerations, trial counsel made a reasonable judgment call against consulting experts in the case." (cleaned up)); *see also State v. King*, 2017 UT App 43, ¶¶ 27–28, 392 P.3d 997 (noting that counsel's prior experience with a category of evidence precluded additional need to consult with an expert). We thus reject Wright's ineffective assistance claim regarding Counsel's treatment of the DNA evidence.

D.    Voice Identification Evidence

¶75 Wright next argues that Counsel performed ineffectively by choosing "not to consult with voice identification experts" or have any such expert testify at trial regarding the Voicemail. Wright asserts that Counsel was unfamiliar with voice identification evidence, and thus should have consulted an expert. Wright relatedly asserts that Counsel should have called an expert to testify about the poor quality of the recording used to capture the Voicemail.[12]

---

12. Specifically, Wright asserts that Counsel should have used the expert called by the *State* at the rule 23B hearing, who testified that the recording used to capture the voice on the Voicemail was of too low quality to be forensically compared under prevailing FBI standards and protocols. This was in response to the assertion by Wright's expert—whom the rule 23B court found could not testify based on various problems under rule 702 of the Utah Rules of Evidence—that he analyzed and

(continued…)

¶76   Wright's claim regarding the voice identification testimony was also remanded under rule 23B.[13] Wright asserts that the rule 23B court "incorrectly concluded" that a reasonable basis existed for Counsel to not consult with or have an expert testify at trial "based on several incorrect conclusions about [C]ounsel's performance, none of which actually made it reasonable not to investigate this evidence and consult with an expert." The rule 23B court made numerous findings to support its conclusions that Counsel's conduct was reasonable, and Wright does challenge a great many as being clearly erroneous. But we need not address most of Wright's challenges because the rule 23B court's conclusions can be supported on the findings discussed below.

---

(…continued)
compared the Voicemail recording with other recordings of Wright's voice and determined that the speaker in the Voicemail was not Wright.

13. In his motion for the rule 23B remand, Wright also asserted that Counsel should have called a number of his family members to testify that the voice on the Voicemail was not his, rather than having only one witness who was familiar with Wright's voice but not related to him testify to the same. We granted the motion based on this ground as well, but it is unclear if Wright is actually challenging the rule 23B court's findings or conclusion that Counsel's conduct was reasonable in this regard. To the extent that he is, we simply note that we agree with the rule 23B court's findings and conclusion that it was a reasonable strategy for Counsel not to call a number of witnesses who could have been easily impeached for bias. This is especially true in light of the unchallenged factual finding that, mid-trial, Wright's uncle expressed his belief to Counsel that it was indeed Wright's voice on the Voicemail.

¶77 The rule 23B court concluded that "Counsel's decision not to hire or have a voice identification expert testify at trial was a legitimate strategic choice." The rule 23B court found, among other facts, that Counsel knew the State's position at trial was that the voice on the Voicemail belonged to Wright," knew "multiple recordings of [Wright's] voice were going to be played at trial [and] that the jurors themselves could contrast the voices," and "*reasonably believed* it was plain that the voice on the [Voicemail] was not [Wright's] when compared with the other voice recordings and that this would be obvious to anyone," including the jurors. (Emphasis added.) Accordingly, the rule 23B court found that Counsel "reasonably believed that hiring a voice identification expert to tell [the jury members]" what they could determine on their own "was not necessary." The rule 23B court also found that Counsel's strategy was based on a "reasonable belie[f] that if they called a voice identification expert, the State would have countered by calling its own expert, and that the voice identification issue would turn on which expert was more believable."

¶78 We agree with the rule 23B court that Counsel's decision not to consult with an expert was not objectively unreasonable if Counsel reasonably believed that it would be obvious to the jurors that Wright's voice did not match that on the Voicemail. *State v. King*, 2017 UT App 43, ¶ 26, 392 P.3d 997 ("Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (cleaned up)); *State v. Montoya*, 2004 UT 5, ¶ 24, 84 P.3d 1183 ("If counsel has reason to believe that pursuing certain evidence would be fruitless or even harmful, a tactical decision not to investigate may indeed be reasonable." (cleaned up)). And Wright has not demonstrated that it was clearly erroneous for the rule 23B court to find that counsel's belief in this regard was reasonable; instead, Wright only argues that Counsel's belief was "wrong" because he was convicted. But the possibility that Counsel's

belief about the Voicemail may have been wrong does not preclude a finding that the belief was nevertheless reasonable. And other evidence in the record supports that Counsel's belief was reasonable—in particular, testimony from Wright's own expert at the rule 23B hearing, who expressed his opinion that "any objective listener" could tell the difference between the voice on the Voicemail and other recordings of Wright's voice. We thus agree with the rule 23B court that Counsel's choice not to consult with an expert was objectively reasonable under these circumstances.

¶79    We likewise agree with the rule 23B court that Counsel's decision not to call an expert at trial was not objectively unreasonable under the circumstances. *See State v. Alzaga*, 2015 UT App 133, ¶ 86, 352 P.3d 107 ("Counsel's decision to call or not to call an expert witness is a matter of trial strategy, which will not be questioned and viewed as ineffectiveness unless there is no reasonable basis for that decision." (cleaned up)). As noted above, the rule 23B court's conclusion was based on Counsel's reasonable belief that they did not need to call an expert to explain something the jury members could determine on their own *and* because it was not objectively unreasonable for Counsel to avoid a possible battle of the experts. Wright only argues that the rule 23B court erred with regard to its finding about the battle of the experts, asserting that "[t]his ignores the point of a criminal trial, to subject evidence and theories to meaningful adversarial testing." But "there are countless ways to provide effective assistance in any given case," and Wright's conclusory argument fails to demonstrate why Counsel was constitutionally required to present an expert. *See id.* (cleaned up); *see also McCloud v. State*, 2019 UT App 35, ¶ 48, 440 P.3d 775, *cert. granted*, 455 P.3d 1058 (Utah 2019) (noting that counsel can make strategic choices to avoid "transform[ing] the case into a battle of the experts" (cleaned up)).

¶80   Based on the foregoing, Wright has failed to demonstrate that Counsel performed deficiently with regard to the Voicemail. Accordingly, we reject this ineffective assistance claim.

E.   Closing Arguments

¶81   Wright next argues that Counsel was ineffective for not objecting to two instances of alleged prosecutorial misconduct during the State's closing arguments. First, Wright argues that the State engaged in misconduct when it suggested that Counsel intended to mislead the jury. Second, Wright argues the State engaged in misconduct when it "asserted argument from evidence the court had properly excluded." Wright concludes that it was objectively unreasonable for Counsel to fail to object to either instance of alleged misconduct.

¶82   To demonstrate that Counsel performed deficiently in failing to object to the State's comments at closing argument, Wright must first show that the State's comments were improper, meaning that they "call[ed] to the attention of the jurors matters which they would not be justified in considering in determining their verdict." *State v. Jones*, 2015 UT 19, ¶ 54, 345 P.3d 1195 (cleaned up). Assuming he can demonstrate this, Wright must also demonstrate that Counsel's failure to object was objectively unreasonable, i.e., that the State's comments "were so improper that [C]ounsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up).

¶83   Wright first argues that the State made improper comments when it allegedly suggested that Counsel intentionally misled the jury. Wright points to the State's arguments to the jury that "the defense does not have a good defense—they are grasping at straws . . . providing multiple stories hoping you will buy off one" and that the jury should not be "conned by the distractions that have been presented in this

case." Wright argues that Counsel's duty to object to this argument is established by our line of cases holding that "calling defense counsel's theory a distraction or irrelevant is permissible but accusing opposing counsel of using such a distraction as part of a purposeful scheme to mislead the jury is not." *State v. Fouse*, 2014 UT App 29, ¶ 30, 319 P.3d 778.

¶84 Wright has failed to show that Counsel's decision not to object to these arguments was objectively unreasonable. The first quoted statement merely amounted to an argument about the lack of evidence to support the "multiple" stories presented by the defense, and thus reasonable counsel could decline to lodge an objection. The second quoted statement does contain language that, in a vacuum, could amount to arguing that Counsel deliberately attempted to mislead or "con" the jury. But a closer examination of the overall context of this argument convinces us that Counsel could have reasonably concluded that the State's comment was a permissible argument that the defense theory—Friend as the shooter—was "a distraction from the ultimate issue." *Fouse*, 2014 UT App 29, ¶ 32 (cleaned up). Counsel repeatedly referred to Friend as a "con man" throughout the trial and emphasized that, not only was he unethical, but he had even "faked his own death" and "went to prison for wire fraud." Emphasizing that Friend was a "con man" was meant to suggest that he had the motive and capacity to kill Victim, and to cast doubt on investigators' early decision that Friend was not a suspect worth investigating. Counsel thus could have reasonably concluded that the State's argument about not being "conned by the distractions presented in the case" was a reference to the theory that Friend was the shooter, and did not merit an objection.

¶85 Wright next argues that the State made improper comments when it argued that it would not have been difficult for Wright—who was left-handed—to shoot the gun with his right hand. Wright points to the fact that the district court

excluded the State from presenting an expert witness, who would have testified about non-dominant hand shooting, and asserts that the district court ruled that this evidence was "irrelevant." Wright thus argues that Counsel was required to object to the State's closing arguments because a "prosecutor may not assert arguments" that "refer to evidence not in the record or evidence that has been excluded by the trial court." *State v. Larrabee*, 2013 UT 70, ¶ 24, 321 P.3d 1136 (cleaned up).

¶86 Wright again fails to show that Counsel's decision to not object was objectively unreasonable. As an initial matter, the district court did not exclude the State's expert on the ground that his testimony was irrelevant; instead, the district court excluded the expert on the ground that his testimony was not "going to significantly aid or assist the jury in understanding the issue of nondominant hand shooting." Accordingly, the district court did not make a categorical ruling that non-dominant hand shooting was irrelevant or excluded. Nor was the permissibility of the State's closing argument contingent on the expert testifying about non-dominant hand shooting. Rather, the State's closing argument merely asked the jury to make a reasonable inference, based on common sense and deductions drawn from other evidence presented, that Wright used his non-dominant hand to shoot the victim. *See State v. Bakalov*, 1999 UT 45, ¶ 59, 979 P.2d 799 ("[T]he prosecutor may fully discuss with the jury reasonable inferences and deductions drawn from the evidence."). And the district court's ruling further suggested that this type of inference was one a jury could make without the aid of expert testimony. Accordingly, Counsel could have reasonably concluded that the State's closing argument about non-dominant hand shooting did not merit an objection.[14]

---

14. Wright also argued that the cumulative error doctrine warrants reversal. But "[a]lthough [Wright] has alleged several

(continued…)

CONCLUSION

¶87    The district court did not err in admitting Eyewitness's identification testimony at Wright's trial. Nor did Counsel provide ineffective assistance.

———————

¶88    Affirmed.

———————

(…continued)
errors, we have found none. Therefore, the cumulative error doctrine does not apply." *State v. Widdison*, 2001 UT 60, ¶ 73, 28 P.3d 1278.