2025 UT App 165

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TROY DEAN RICHEY,
Appellant.

Opinion
No. 20210565-CA
Filed November 13, 2025

Third District Court, West Jordan Department
The Honorable Matthew Bates
No. 201905436

Erick Grange, Attorney for Appellant

Derek E. Brown and Marian Decker,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Troy Dean Richey challenges his convictions of forcible sodomy and two counts of voyeurism. On appeal, Richey raises several ineffective assistance of counsel claims. Contemporaneous with his appellate brief, Richey also filed a motion pursuant to rule 23B of the Utah Rules of Appellate Procedure asking us to remand this case to the district court for an evidentiary hearing to develop additional record evidence to support his ineffective assistance claims. We granted that request with respect to some of those claims. Having considered both the appellate record and the record developed on remand, we affirm Richey's convictions.

BACKGROUND[1]

*The Crimes*

¶2 Richey met Sandy[2] on an online dating app in August 2017. After their initial meeting in person, the pair became "inseparable." Sandy believed the two had "strong chemistry," and the relationship became sexual "rather quickly."

¶3 At the time Sandy met Richey, she consumed alcohol only "on occasion," and she was "very proud of the fact that [she] had never been drunk." Richey would "often" bring alcohol with him, which "was not a problem" to Sandy because she "enjoyed a good glass of wine."

¶4 In January 2018, after having a glass of wine at Richey's apartment, Sandy felt "a little strange"; she was "giddy, playful," and her "inhibitions were down." Although Sandy had some difficulty walking and was "wobbly," she did not pass out and was "aware" of what was going on. Sandy suspected Richey had put something in her wine glass other than wine, so she asked him multiple times throughout the night if he had done so. Richey initially denied adding anything; however, after Sandy noticed "residue in the bottom of the glass," Richey admitted to adding "a little vodka" to Sandy's wine. Sandy told Richey that she did not give him permission to add anything to her drink and that he "shouldn't have done that," to which Richey responded, "It was good for you. You enjoyed it." Sandy decided to "let that go."

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (quotation simplified).

2. A pseudonym.

¶5 In April 2018, Sandy found lesions on her labia. Prior to this, she had observed lesions on Richey's penis while performing oral sex. When she asked Richey about the lesions, Richey said that he had "nicked" himself shaving. Thereafter, Richey accompanied Sandy to a doctor's appointment where a lesion test was performed. The test indicated that Sandy had herpes. Sandy did not have herpes before dating Richey, and she had not had sexual activity with other people since meeting Richey in August 2017. Although Richey was typically "very demanding" when it came to oral sex, after receiving the positive test results, Sandy told Richey "clearly" that she would no longer perform oral sex on him and that "[i]t didn't matter what he wanted." After this discussion, Richey "kind of gave in" because he knew Sandy was "so disgusted."

¶6 Soon after receiving the test results, Richey and Sandy's relationship changed "dramatically." Sandy felt "betrayed" and "disgusted" and "was afraid to have sex" with Richey. Sandy decided to end the relationship.

¶7 After ending the relationship in April, Sandy continued to talk to Richey because she "didn't have anyone else to talk to," but their relationship "was very sporadic." In December 2018, the two began "talk[ing] more," and Richey told Sandy that "he wanted to try and start over." Richey apologized "profusely" for his past behavior, so Sandy "agreed to have a weekend to try to start over."

¶8 On Friday, December 14, 2018, Richey arrived at Sandy's house. Richey drove Sandy to dinner. The couple "had a lovely dinner" together; although Sandy did not specifically remember drinking alcohol at dinner, she believed that she "maybe had a glass of wine."

¶9 After dinner, Richey took Sandy to look at Christmas lights. On the way, Richey stopped at a grocery store and purchased eggnog. Richey then stopped at a gas station and entered alone. When he returned to the car, he handed Sandy a

twenty-four-ounce thermos full of heated eggnog. Richey knew Sandy "loved eggnog," and he was "excited" to give it to her so that she would have something warm to drink while looking at the lights. Sandy tasted the eggnog and thought it "tasted like eggnog"; although "it was a little runny, . . . it was good." Sandy did not taste any alcohol, nor did Richey mention mixing anything into the eggnog. Sandy drank all but "an ounce or two" of the eggnog.

¶10    From the gas station, the couple drove to a drive-through light display, where they spent approximately twenty minutes looking at the lights. At that point, Sandy "started yawning" and "feeling really tired." Although the couple had planned to visit a second light display, Richey proposed that they return to Sandy's house, to which Sandy agreed. Once at the house, they sat in the front room next to the Christmas tree and talked. Richey expressed "that he was grateful for the evening," and he asked Sandy to "just be open to let things happen." Sandy agreed that it had been a nice night. She also told Richey that she was "open" but reminded him that she would "never" again perform oral sex on him. Richey replied that he understood but again asked her "to be open tonight." Sandy agreed.

¶11    After about twenty minutes of talking in the front room, Richey asked Sandy to move to her bedroom, and Sandy agreed. Sandy was "open" to "sexual activity" and "intimacy" with Richey—"except . . . oral sex"—"if [they] could get to that connection." As the two moved to the bedroom, Sandy was feeling "extremely tired," and her "head was very heavy." As Sandy leaned back on the pillows, Richey started to massage her feet. Sandy "got really groggy," so she asked Richey, "Can you do that later?" Richey stopped massaging her feet, "crawled up to where [Sandy's] head was, and . . . started kissing [her]." At that point, Sandy was fully clothed.

¶12    When Sandy awoke the next morning, she was "kind of delirious," "in a fog," and "couldn't see straight." Her head "was pounding," and she was experiencing "extreme pain" in her

lower back. Sandy had never felt like this after having a glass of wine. Richey was not there, so Sandy texted him, asking where he was. The following text chain ensued:

> Sandy:      Where are you?
>
>                 I feel sick [Richey] and can barely remember last night. What happened?
>
>                 Why did you leave me Baby?
>
> Richey:     I had to run home honey I'll be back in 45 minutes
>
>                 I'll call when I'm leaving
>
> Sandy:      Ok. I love you . . . SO much
>
> Richey:     I love you so much [Sandy]
>
> Sandy:      I'm excited to wake up to you. Hurry back and wake your Sleeping Beauty with a kiss.
>
> Richey:     Mmmmmmm
>
> Sandy:      My body misses you . . . come make gentle love to me again.

(Ellipses in original.)

¶13    Richey did not return on Saturday morning. Later that same day, Sandy decided to call a friend (Friend) for help because she "knew something was wrong"—she "couldn't function" and her "head was spinning." Sandy knew that "Richey had Ambien and Xanax at his availability and he would use those sometimes to overdo," so she "assumed" that Richey had used those pills to drug her. Friend observed that Sandy was "upset," "crying,"

"kind of confused," "a little discombobulated," and "visibly a little groggy," so he suggested that Sandy take a drug test. Sandy agreed, so Friend drove her to a clinic to have the test performed.

¶14 Sandy tested negative for "[e]very standard drug" that would normally be present in "a date-rape situation." Sandy did not request that the test screen for alcohol, however, because she "had no reason to think alcohol would" affect her that way.

¶15 As the day progressed, Sandy began to have "flash[] back" memories of "disturbing things" from the night before. Sandy remembered that sometime after Richey started kissing her on the bed, he "aggressive[ly]" put his fingers inside her. She also remembered that Richey "straddl[ed]" her arm, pinning it down, and proceeded to "shove his penis into [her] mouth" even though "he knew [she] would never do that with him again." Sandy remembered attempting to fight Richey off using her hand that was not pinned, and that she verbally told him "no."

¶16 Sometime on Saturday afternoon, Sandy discovered that Richey had left "flowers and a birthday card for someone else on her table." Sandy then confronted Richey by text: "So done with your lies and deception. No wonder you had no suitcase. You had other plans—to use me again and move on. . . . Sorry she had to go without her flowers. #DespicableHumanBeing." (Ellipsis in original.)

¶17 By Saturday night, Sandy "was in a bad place." She concluded that, based on her memories of Richey "trying to shove his penis into [her] mouth when he knew [she] would never do that with him again," she had been raped. She called a rape hotline to ask about her rights as a victim. She also decided to confront Richey again by text. Shortly before 9:00 p.m., she sent Richey the following message: "It took awhile for the effects to wear off [Richey], but my memory is coming back. I know what you did to me last night."

*The Investigation*

¶18    On Monday morning, Sandy underwent a sexual-assault examination. Sandy declined to tell the nurse examiner (Nurse) the name of her assailant because she was "afraid" of Richey. After the exam, Sandy reported the incident to the police. Sandy "explained very clearly [to the police] . . . that [she] wanted nothing to do with [Richey] ever again"; however, she agreed to contact Richey again because the police "needed evidence" and Sandy "wanted answers."

¶19    To that end, Sandy recorded two phone calls with Richey: one in January 2019 and another in February 2019. In the first call, Sandy repeatedly asked Richey to explain what had happened on the night in question. She told Richey that although she was "practically unconscious," she "remember[ed] [Richey] straddling [her] face" despite the fact that Richey had "promised [he] would never try oral sex on [her] again." Sandy also asked Richey if he had put anything in the eggnog or if he had filmed any part of the evening. Richey adamantly denied doing either.

¶20    The second call (the pretext call) lasted for nearly an hour. Throughout the pretext call, Sandy pressed Richey for information about the incident. She told Richey that other than kissing him, the only things she remembered from that night were "traumatic things." She elaborated that she experienced "flashbacks" of Richey putting his "fingers inside [her]" and "straddling [her] face and trying to put [his] penis in [her] mouth." Sandy made clear that while she "wasn't ready for that," she had been "ready to be intimate with [Richey]."

¶21    After asking Richey multiple times what he had put in her eggnog, Richey eventually admitted to adding "a whole pint of Everclear" to the eggnog. Sandy expressed doubt that Everclear could have "knocked [her] out," and she also questioned how she did not "feel the burn" or "taste [Everclear] at all" while she was drinking the eggnog. Richey assured her that the eggnog masked the taste. He also apologized, saying, "I'm sorry. I'm stupid."

¶22    Although Richey admitted that he had spiked the eggnog, he continually disputed Sandy's assertions that she had "pass[ed] out." Richey maintained that Sandy was "fully engaged" and that he "would never ever take advantage of some[one] passed out." He claimed that "things started" when Sandy "went down on [him]." Sandy disagreed, reminding Richey that he "knew that [she] didn't want to do that." Richey again apologized, saying, "I'm sorry for that night."

¶23    In addition to discussing the assault, Sandy asked Richey about the details of their January 2018 date, including whether Richey had put anything in her wine that night and whether Richey had recorded them having sex. Richey denied adding anything to Sandy's drink (though that night he had admitted to putting vodka in her wine); however, he admitted to filming Sandy with a "concealed" camera without her permission. Richey acknowledged that filming Sandy "was wrong" and that he "should have" told her.

¶24    Toward the end of the pretext call, Sandy told Richey that she no longer trusted him and that she did not believe that he would not hurt her or her family. She explained, "I heard the way you would yell at [your ex-girlfriend's] family. I heard the things you said. How vicious you get because of those damn Adderall and the pills and the Ambien and all these things." Sandy also told Richey that he had already hurt her physically: "You hit me on my back and then the other night when you grabbed my boob I had to literally ice my breast." Richey jokingly apologized, "Sorry, milk shake; ice cream. I'm sorry."

¶25    Richey was charged with forcible sodomy, object rape, and two counts of voyeurism.[3]

---

3. Richey was also charged with evidence tampering and two counts of witness tampering. Those counts were severed before trial and are not at issue in this appeal.

*The Preliminary Hearing*

¶26  A preliminary hearing was held in July 2020. Sandy testified that on the night of the incident, she "wasn't opposed to intimacy" with Richey but she was "very clear on certain things [she] wasn't going to do." She explained that she was on the bed with Richey and he was rubbing her feet when she started "to feel really tired." She then asked, "[C]an you do that after because I'm feeling pretty tired. Let's—you know, do that afterwards. That can be the aftercare." After this, Sandy asked Richey to "come up and sit next to [her]" and they started kissing, but after this point, Sandy's memory was "spotty." Sandy remembered Richey "attempting to plunge into [her vagina] with his fingers." She also remembered Richey "kneeling next to [her,] shoving his penis . . . in [her] mouth." Sandy "fought him," told him "[n]o," and "shoved him back."

¶27  Sandy testified that after the incident she sent Richey a text message where she called Richey a "sick predator" and claimed that he drugged and raped her. Richey's counsel (Counsel) asked Sandy to clarify the date and time of the text message. Sandy initially thought the message was sent two days after the incident but then located the message in her phone and clarified that the message was sent about a month after the incident.

¶28  Sandy also discussed her relationship with Richey between their April 2018 breakup and the December 2018 incident. On direct examination, she admitted that "there easily could have been" sexual activity during that time. And on cross-examination, she agreed with Counsel's statement that "there could have been some sexual activity" during that time.

¶29  The State moved to admit two segments of the pretext call. Counsel objected on the ground that he did not want the statements on the call "selectively edited by the State." He argued that the State had "presented [Richey's statements] as some kind of admission," but when considered in "the context of the entire call," the statements were merely Richey "trying to pacify

[Sandy]." The State did not oppose admitting the pretext call in its entirety.

*The Trial*

¶30     The State called four witnesses at trial: Friend, Nurse, a forensic nurse, and Sandy. Friend testified consistently with the account above. Nurse testified about performing a sexual assault examination on Sandy and her report of the examination. Nurse stated that during the exam she discovered a sore on Sandy's cervix that would not have been caused by "normal sexual intercourse"; however, Nurse also acknowledged there was no way to tell exactly when the injury had occurred. The forensic nurse testified about the general effects that alcohol has on the body.

¶31     Sandy also testified consistently with the above. In addition, she read for the jury the text messages sent to Richey the day after the incident as well as the message sent about a month later calling him a "sick predator." When reading the morning-after messages, Sandy did not read the final message in the exchange—"My body misses you . . . come make gentle love to me again."—because it was "cut off" in the exhibit. (Ellipsis in original.) And Sandy claimed that she sent the "sick predator" message on the Sunday after the incident. Counsel elected not to cross-examine Sandy.

¶32     The State admitted four audio recordings that Sandy had made without Richey's knowledge, one of which was the pretext call where Richey admitted to having filmed Sandy during their January 2018 date with a "concealed" camera and where Sandy accused Richey of domestic violence and substance abuse. In addition, the State introduced two videos that Richey had recorded of him and Sandy having sex to support the two voyeurism charges.

¶33     In closing argument, Counsel argued that the charges against Richey were based solely on Sandy's "bald allegation"

and lacked evidentiary support. He posited that Sandy came up with the false "narrative" after Richey did not return to her house on the morning after the assault. On rebuttal, the prosecutor countered that the lack of "independent witnesses" was because sex crimes "are committed in secrecy." The prosecutor also asserted that Sandy did not remember what had happened to her in the morning when she first awoke but that, "[a]s the morning progresse[d], because of the trauma and because of the huge amount of alcohol she was given secretly, the memories start[ed] to come back to her."

¶34 The jury convicted Richey of forcible sodomy and both counts of voyeurism but acquitted him on the object rape charge. Richey timely appealed his convictions. Contemporaneous with the filing of his appellate brief, Richey also filed a motion pursuant to rule 23B of the Utah Rules of Appellate Procedure asking us to remand this case to the district court for an evidentiary hearing to develop additional record evidence related to several ineffective assistance of counsel claims. We granted that request with respect to some of those claims. The rule 23B court held a two-day evidentiary hearing and subsequently entered findings of fact addressing the various issues on which we granted remand. We recount the relevant rule 23B findings when those issues are addressed below.

## ISSUES AND STANDARDS OF REVIEW

¶35 Richey argues Counsel provided ineffective assistance in multiple ways related to Sandy's testimony, the prosecutor's closing argument, and the admission of the pretext call. The claims Richey has "raised for the first time on appeal" present questions of law that we review for correctness. *State v. Wright*, 2021 UT App 7, ¶ 26, 481 P.3d 479 (quotation simplified). And "for the ineffective assistance claims that were subject to the rule 23B remand, we defer to the trial court's findings of fact." *Id.* (quotation simplified).

ANALYSIS

I. Ineffective Assistance of Counsel

¶36    Richey asserts twelve total claims of ineffective assistance of counsel. Of these claims, nine were raised in Richey's direct appeal. The remaining three claims were the subject of the rule 23B remand.

¶37    To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires the defendant to show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Id.* at 687. "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Wright*, 2021 UT App 7, ¶ 52, 481 P.3d 479 (quotation simplified).

¶38    To prove deficient performance under the first *Strickland* prong, Richey must show that Counsel's actions "fell below an objective standard of reasonableness." 466 U.S. at 688. "It is not enough for the defendant to simply point to some strategy other than the one that counsel employed that looks superior given the actual results of trial." *Wright*, 2021 UT App 7, ¶ 53 (quotation simplified). Instead, Richey must overcome the "strong presumption" that Counsel's actions fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S at 689. "The court gives trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified). "Decisions as to what witnesses to call, what objections to make, and by and large, what defenses to interpose, are generally left to the professional judgment of counsel." *Wright*, 2021 UT App 7, ¶ 53 (quotation simplified). And "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

¶39　To establish prejudice under the second *Strickland* prong, Richey "must show that there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

¶40　Richey contends Counsel provided ineffective assistance when he failed to (A) present important evidence or cross-examine Sandy, (B) object to prosecutorial misconduct, and (C) ask the court to exclude certain portions of the pretext call. We address each in turn.

¶41　Before turning to our analysis of Richey's claims, we reiterate this court's prior admonition that "[a]n ineffective assistance of counsel claim is not an invitation to flyspeck the record and, with the luxury of time and the benefit of hindsight, identify ways in which counsel might have been even more effective." *State v. Boyer*, 2020 UT App 23, ¶ 65, 460 P.3d 569. And we note that "an appellate court has discretion as to the nature and extent of the opinions it renders and we need not address in writing each and every argument, issue, or claim raised and properly before us on appeal." *State v. Draper*, 2024 UT App 152, ¶ 124, 560 P.3d 122 (quotation simplified).

A.　Failure to Present Evidence or Cross-examine Sandy

¶42　Richey argues Counsel "was ineffective because he failed to present important evidence or cross-examine [Sandy]—the only witness to the alleged offense—even though [Counsel] had evidence to show important inconsistencies in [Sandy's] testimony and corroborate Richey's account." Specifically, he contends that Counsel should have presented evidence or cross-examined Sandy on the following nine points: (1) Sandy and Richey "were or easily could have been having consensual intercourse during the months leading up to the incident," (2) Sandy "invited Richey to have consensual intercourse" the night of the incident, (3) Sandy "wanted to have intercourse with

Richey again the morning after" the incident, (4) Sandy "falsely testified that she called Richey a predator two days after" the incident, (5) Sandy "gave inconsistent statements about using force to resist the alleged offense," (6) Sandy's "trial testimony conflicted with her statement to [Nurse] that the two had consensual intercourse," (7) Sandy relied on Richey emotionally after the incident, (8) Sandy was "looking forward to having sexual intercourse with Richey" the night of the incident, and (9) Sandy was not afraid of Richey. We address each of these in turn.

1.     Prior consensual intercourse

¶43    Richey contends Counsel rendered ineffective assistance when he failed to present evidence or to cross-examine Sandy about certain pre-trial statements Sandy made regarding her relationship with Richey after they broke up in April 2018.

¶44    At trial, Sandy testified that she broke up with Richey after she suspected that she contracted herpes from him. Sandy explained that she felt "betrayed" and "disgusted" and "was afraid to have sex" with Richey. Sandy also acknowledged that after the two broke up, they continued to communicate throughout that year because she "didn't have anyone else to talk to," but she described their relationship as "very sporadic."

¶45    Richey argues Counsel performed deficiently by failing to cross-examine Sandy or otherwise introduce evidence of the following statements that show she and Richey "likely were having sexual intercourse during the months leading up to the incident": (1) Sandy's statement to police that she "had consensual sex approximately 3 times" with Richey between April and October and (2) Sandy's preliminary hearing testimony that "there easily could have been" sexual activity during that time. Richey argues this failure "allowed the jury to falsely believe that [Sandy] and Richey's relationship ended in April, that [Sandy] was 'afraid to have sex with him,' and that the two rarely talked until the alleged incident." We disagree.

¶46　As an initial matter, Richey accounts for only part of Sandy's trial testimony. Immediately after stating that her relationship with Richey had been "very sporadic" from April to December, Sandy testified that in December, their relationship began "to change": Richey "was trying really hard to reconnect," the two started "talk[ing] more," and Sandy "agreed to have a weekend to try to start over." And Sandy later averred that she was "open" to "sexual activity" and "intimacy" with Richey on that weekend—"except . . . oral sex"—"if [they] could get to that connection." When considered as a whole, Sandy's testimony left no doubt that she and Richey were regularly communicating during the time leading up to the incident. Moreover, it was clear that Sandy was not "afraid to have sex" with Richey since she explicitly stated that she was willing to do so during their weekend "if [they] could get to that connection."

¶47　Given that jurors heard Sandy was willing to engage in sexual intercourse with Richey at the time of the incident, it was reasonable for Counsel to conclude that there was little to be gained from cross-examining Sandy about the possibility that she either had or "easily could have" engaged in sexual activity with Richey after they broke up but before the assault. Sandy consistently maintained that after discovering that Richey had likely given her herpes, she opposed oral sex, but she admitted to being "open" to other "sexual activity." Thus, had Counsel questioned Sandy about her relationship with Richey between April and October, it is likely that Sandy would have explained that while she was afraid to have oral sex with Richey during this time, she was not opposed to other sexual activity, including intercourse. In that scenario, Sandy's testimony would have little to no impeachment value. But more importantly, such testimony would have further emphasized Sandy's vociferous aversion to having oral sex with Richey, which is the act underlying the forcible-sodomy charge. Given all this, we cannot say it was objectively unreasonable to choose, and there appears to be a clear strategic reason, to forgo cross-examining Sandy or otherwise introducing these statements, and Counsel's performance was therefore not objectively deficient.

2.     Invitation for consensual sexual intercourse

¶48    Richey contends Counsel rendered ineffective assistance for failing to present evidence or cross-examine Sandy on her prior statements that she invited Richey to have consensual intercourse on the night of the incident.

¶49    Sandy testified at trial that on the night of the incident, Richey was massaging her feet in bed. Sandy "got really groggy," so she asked Richey, "Can you do that later?" Richey then "crawled up to where [Sandy's] head was, and he started kissing [her]." Later, the pretext call wherein Sandy recounted this conversation was played for the jury:

> Sandy:     I remember you kissing me when I said you were rubbing my feet and then I said, "Hey, you know, can you do that after because that's when I'm going to need the intimacy?"
>
> And you said, "Of course." And you moved up to be with me and you kissed me.
>
> Richey:    On the couch?
>
> Sandy:     No, on the bed. We went to the bedroom and you were massaging my feet and then I said, "Hey, can you do that afterward?"
>
> And you said, "Of course."
>
> Richey:    Oh, okay. After we made love, okay.
>
> Sandy:     Yeah, because I wanted the closeness then.

¶50 According to Richey, Sandy's question "[C]an you do that afterward?" constituted an invitation to have intercourse. However, he argues that the evidence presented at trial was "conflicting" and "left that fact ambiguous" and that Counsel performed deficiently by failing to clarify the meaning behind Sandy's question by presenting evidence or cross-examining Sandy about her prior statements on the matter. This claim fails for the same reasons as the previous claim. Namely, Richey narrowly focuses on but one aspect of Sandy's testimony and ignores that Sandy was clear that she was "open" to engaging in sexual activity, "*except . . .* oral sex." (Emphasis added.) Because the jury was well aware of this fact, it was not unreasonable for Counsel to forgo cross-examining Sandy about what she meant when she asked that question. Indeed, had Counsel done so, and even had Sandy testified that she was not only open to intercourse, but also invited it, it is just as likely she would have again emphasized her opposition to having oral sex with Richey—the act underlying the forcible-sodomy charge. It was thus a clear matter of strategy for Counsel not to pursue additional explanation. And where a reasonable strategy exists, Counsel has not performed deficiently. *See State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

3.     Morning-after text messages

¶51 Richey argues Counsel rendered ineffective assistance for failing to introduce evidence or impeach Sandy with her text message to Richey the morning after the incident stating she wanted to have sex "again."

¶52 At trial the State submitted two exhibits containing pictures of a text message conversation between Sandy and Richey the morning after the incident, which Sandy was asked to read aloud:

> Sandy:     Where are you?

> I feel sick [Richey] and can barely remember last night. What happened?
>
> Why did you leave me Baby?

Richey: I had to run home honey I'll be back in 45 minutes

I'll call when I'm leaving

Sandy: Ok. I love you . . . SO much

Richey: I love you so much [Sandy]

Sandy: I'm excited to wake up to you. Hurry back and wake your Sleeping Beauty with a kiss.

Richey: Mmmmmmm

(Ellipsis in original.) After reading Richey's message, Sandy testified that the next message from her to Richey was "cut off" in the exhibit. However, a copy of that message was included in the police report: "My body misses you . . . come make gentle love to me again." (Ellipsis in original.)

¶53 Richey argues Counsel performed deficiently by not presenting evidence of the final text message or cross-examining Sandy on its contents because the evidence would have impeached Sandy's testimony and supported Richey's defense that all the sexual activity was consensual. In particular, he asserts that, contrary to Sandy's testimony at trial, the message showed that (1) Sandy "remembered that morning that they had intercourse the night before and that she wanted to do so again" and (2) Sandy had exaggerated her physical symptoms (i.e., she was "in a fog," "couldn't see straight," and her head "was pounding") because "a person with those symptoms normally

does not plan to engage in physical activities." Neither argument is availing.

¶54 As to the first claim, Richey again mischaracterizes Sandy's testimony. When asked about waking up the morning after the incident, Sandy testified that "it took a bit" for her to remember what had happened. She stated that "in the afternoon," she remembered that Richey had been "trying to shove his penis into [her] mouth when he knew that [she] would never do that with him again." Sandy did not mention having intercourse, nor did she deny doing so. Thus, properly viewed, a capable defense attorney could reasonably conclude that the text message did not contradict Sandy's testimony and therefore could not be used to impeach her. Moreover, given that Sandy was clear that she was open to being intimate with Richey "if [they] could get to that connection," it was reasonable for Counsel to conclude that asking Sandy about the text would neither contradict nor undermine her testimony, because she had testified only that she remembered the forcible sodomy later, not the consensual intercourse.

¶55 Furthermore, as with Richey's prior ineffective assistance claims, Counsel had a legitimate tactical reason to not present the text message. Sandy was "open" to intercourse, and indeed expected intimacy on the night in question. But Sandy was clear that she would not engage in oral sex. Thus, Counsel had to weigh the risk of emphasizing that while Sandy might have consented to intercourse either the night of the incident or the next morning, she adamantly opposed having oral sex, which, again, is the act underlying the forcible sodomy charge. *See State v. Strain*, 885 P.2d 810, 815 (Utah Ct. App. 1994) (stating that forgoing cross-examination is a legitimate trial strategy to avoid giving a witness the opportunity to "bolster[] his testimony with further detail").

¶56 And as to Richey's second claim regarding Sandy's physical symptoms, Counsel could have reasonably understood that if asked about the message, Sandy's explanation would not impeach her. Notably, Sandy's final text to Richey before the text

that was cut off instructed him, "Hurry back and wake your Sleeping Beauty with a kiss." Counsel could have concluded that even if Sandy was feeling unwell, she was planning on trying to sleep it off and that she would engage in sexual activity with Richey when she was feeling better. Moreover, Sandy specifically asked for "gentle" love-making. Counsel could reasonably believe that Sandy's request was reflective of how she was feeling, and that the text would not impeach Sandy.

¶57    For all these reasons, Counsel did not perform deficiently in handling Sandy's morning-after text messages.

4.    "Sick predator" text message

¶58    Richey argues Counsel rendered ineffective assistance for failing to introduce evidence or cross-examine Sandy on her inaccurate testimony that she called Richey a "sick predator" two days after the incident.

¶59    At trial, the State introduced a text message conversation between Sandy and Richey where Sandy called Richey a "sick predator" and claimed that he drugged and raped her. Sandy testified that she sent the messages on Sunday—two days after the incident—because she "believed [Richey] had drugged [her] and raped [her]." However, at the preliminary hearing, where Sandy had access to her phone, she confirmed that she sent that message about a month after the charged assault. Counsel made no attempt to expose this error or correct it.

¶60    Richey argues Counsel's failure to present accurate evidence to contradict Sandy's inaccurate testimony or to cross-examine Sandy constituted deficient performance because the jury never heard the correct timing of the text messages. He contends evidence of the timing is important because (1) "it impeaches [Sandy's] ability to remember the events surrounding the alleged incident" and (2) it "calls into question whether [Sandy's] interactions with [Nurse] or the police altered and solidified [Sandy's] memory of the alleged incident."

¶61 We are not persuaded that Counsel's failure to cross-examine Sandy about the timing of the text message constituted deficient performance. First, reasonable counsel could conclude that questioning Sandy about the message would not have the impeachment value that Richey now contends. The exchange at trial in which the message was introduced was somewhat ambiguous. The State had asked Sandy if she had been texting Richey on Sunday, and she confirmed that she had. The State then presented Sandy the exhibit with a picture of the text message. The only date visible in the picture is "Sunday." Sandy was then asked again if she sent the text "[o]n Sunday," to which she replied, "On Sunday, yeah." Given the nature of the exchange, it was not unreasonable for Counsel to conclude that asking Sandy to clarify the date would have negligible upside as it would further emphasize the message. Counsel could reasonably believe that Sandy's incorrect testimony was the result of the confusing exchange rather than her misremembering the event. This is especially true where Counsel had previously asked her at the preliminary hearing to clarify the date of the message and she had willingly, and correctly, done so.

¶62 Second, the correct timing of the text does not suggest that Sandy's memories were "altered" or "solidified" from her interactions with the police or Nurse. Critically, Sandy contacted Friend the morning after the incident and expressed her concerns that she had been drugged and raped. Later that day, Sandy went to get a comprehensive drug test, and that evening, she called the rape hotline. All of these actions were taken *before* she contacted the police or underwent the sexual assault exam.

¶63 Accordingly, not confronting Sandy about the timing of the "sick predator" text was not objectively unreasonable.

5. Resisting the assault

¶64 Richey contends Counsel rendered ineffective assistance for failing to introduce or impeach Sandy with her statements to

police and Nurse that "contradicted her trial testimony that she resisted the alleged offense."

¶65    Prior to trial, Sandy recounted the incident with Richey to police and Nurse. Her statement to police was that she "recall[ed] [Richey] kneeling over her attempting to put his penis in her mouth, then she passed out again." And her statement to Nurse was that "she remembered [Richey] putting her in [an] uncomfortable [position] and forcing himself in her mouth." But at trial, Sandy testified that she resisted the assault: "[Richey] was shoving his penis into my mouth. . . . I fought him, . . . I pushed him with my . . . hand."

¶66    Richey argues that Sandy's pre-trial statements were inconsistent with her trial testimony in two ways: (1) neither pre-trial statement mentions Sandy using force to resist the assault and (2) Sandy told police that Richey was *attempting* to put his penis into her mouth. Given these inconsistencies, Richey contends Counsel performed deficiently by not impeaching Sandy with her prior statements. He further contends that he was prejudiced by Counsel's failure because showing that Sandy's "account changed over time" would have "undermined" her credibility.

¶67    Richey cannot demonstrate that Counsel performed deficiently by not cross-examining Sandy about her allegedly inconsistent statements for two main reasons. First, as with some of Richey's other claims, his appellate position relies on a nuanced view of the evidence. While some may view Sandy's descriptions of how Richey put his penis into her mouth (i.e. "forcing," "attempting," and "shoving") as contradictory, others could reasonably disagree.

¶68    Second, reasonable counsel could conclude that even if the statements were contradictory, it would be more damaging than helpful to question Sandy on the particulars. *See State v. Arriaga*, 2012 UT App 295, ¶ 21, 288 P.3d 588 (stating that not cross-examining a victim is a reasonable strategy "to avoid rehashing

the dirty details of the victim's testimony in order to point out a few minor inconsistencies here and there"). Sandy was consistent that she had refused to have oral sex with Richey, including the night of the incident, after discovering that he had likely given her herpes. It was reasonable for Counsel to forgo questioning Sandy about the manner in which Richey inserted his penis into her mouth because doing so would have given Sandy the opportunity to reiterate her aversion to oral sex—the conduct underlying the forcible sodomy charge.

¶69 Thus, given that "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," *Strickland v. Washington*, 466 U.S. 668, 689 (1984), we are not persuaded that Counsel performed deficiently by not attempting to cross-examine Sandy about her allegedly inconsistent statements that she attempted to resist the assault.

6. Statements to Nurse

¶70 Richey argues Counsel rendered ineffective assistance for failing to cross-examine and attempt to impeach Sandy with her prior statements to Nurse that Sandy and Richey "had consensual intercourse and that [Sandy] knew Richey had mixed the eggnog with alcohol."

¶71 Three days after the assault, Sandy underwent a sexual assault examination performed by Nurse. As part of that examination, Nurse asked Sandy for a "history" of the event. At trial, Nurse testified that she prepared a report based on this examination. She explained that the report was primarily a summary of what she had been told, although there were a few statements in Sandy's "exact language," which appeared in quotations. Nurse read the report at trial:

> The patient was on a date with a boyfriend.
> She said she was trying to mend a relationship . . .
> with him. Patient states they went out to a fancy

dinner and were planning to go see the city Christmas lights. The patient states they stopped at a store and got an eggnog drink, then went to a gas station to warm it up.

Patient states that he went in alone to mix the drinks . . . and that he decided to go home to her house. They started with consensual intercourse. "Things got foggier" and she was unable to remember what happened. Then she remembered him putting her in an uncomfortable position and forcing himself in her mouth. . . . "[H]e had been told that was not to be done."

When she woke up, she was in a weird position and had pain in her left hip and lower back area. He was gone.

Although Counsel briefly cross-examined Nurse, he did not question her regarding this report, nor did he cross-examine Sandy about her statements to Nurse.

¶72 Richey contends that Counsel performed deficiently by failing to cross-examine Sandy about her prior statements to Nurse that (1) Richey "went in alone to mix the drinks" and (2) Sandy and Richey "started with consensual intercourse." According to Richey, these statements contradicted Sandy's trial testimony that she did not know the eggnog was spiked and that she did not consent to sexual intercourse and Counsel should have used them to impeach Sandy and undermine her credibility.

¶73 But reasonable counsel could have concluded that the course of action Richey now proposes would not have been prudent for multiple reasons. First, as with Richey's other arguments, his appellate position relies on a selective reading of the testimony at issue. As recounted above, Nurse read the entire examination report at trial. She explained, however, that the

report was primarily her summary of Sandy's statements, and that the only direct statements made by Sandy were that "[t]hings got foggier" and that "he had been told that was not to be done." Reasonable counsel could have concluded that, if presented with the supposedly inconsistent statements Richey now identifies, Sandy would clarify—and Nurse would reiterate—that those statements were not in Sandy's words. *See State v. Strain*, 885 P.2d 810, 816 (Utah Ct. App. 1994) (stating that the court could "surmise several strategic reasons for limiting cross-examination" of a witness: "avoiding the appearance of personal attacks upon the murder victim or the murder victim's mother, eliminating the opportunity for re-emphasis of testimony, and preventing [the witness] from adding further detail to or otherwise bolstering her testimony").

¶74　In any event, counsel acting "within the wide range of reasonable professional assistance," *see Strickland*, 466 U.S. at 689, could reasonably conclude that questioning Sandy about the statements summarized by Nurse would not be helpful because Sandy could explain the statements in a way that would neutralize any impeachment value and emphasize unfavorable testimony. Richey claims that Sandy understood the eggnog had alcohol in it because she reported that Richey "went in alone to mix the drinks," and "a 'mixed drink' is understood as 'an alcoholic drink.'" While Richey may be correct in his definition of a mixed drink, reasonable counsel could conclude that Sandy would explain that she reached this conclusion *after* the assault, when she began remembering the events of the night. And as for the statement that "[t]hey started with consensual intercourse," Counsel could reasonably conclude that there was no need to cross-examine Sandy on this fact. Indeed, the jury was already aware that Sandy was open to intercourse with Richey "if [they] could get to that connection." And the jury was also equally aware that Sandy was opposed to oral sex. Thus, even if the night "started" with consensual sex, reasonable counsel could conclude that Sandy would explain that she withdrew her consent the moment Richey tried to shove his penis into her mouth, which was the act underlying the forcible sodomy charge.

¶75    Based on the foregoing reasons, we cannot conclude that Counsel performed deficiently for not cross-examining Sandy about her statements to Nurse.

7.    Emotionally relying on Richey after the incident

¶76    Richey argues Counsel rendered ineffective assistance for failing to introduce text messages between Sandy and Richey that would have "impeach[ed] [Sandy's] trial testimony that she only communicated with Richey after the alleged incident to 'get answers.'" Richey claims the text messages show Sandy and Richey "relying on each other emotionally" a week after the assault and therefore Counsel should have used the messages to impeach Sandy's trial testimony and undermine her credibility as a witness.

¶77    This claim was one issue remanded under rule 23B of the Utah Rules of Appellate Procedure. The rule 23B court found that the text messages were provided to Counsel in discovery before trial. The court found that Counsel "reviewed various text-messages in preparation for trial," and Counsel "testified that if the text-messages were provided to him, then he probably looked at them." And while Counsel testified that it "may have been possible" for him to introduce the messages "without being combative with [Sandy]," "the bigger consideration at trial was whether [Sandy] realized whether she was drinking Everclear or not."

¶78    Regarding Counsel's decision to not cross-examine Sandy, the rule 23B court found that Counsel "decided not to cross-examine [Sandy] at trial because he believed [Sandy] had said everything the Defense needed her to say, he believed there was nothing left to ask [Sandy], and he did not want to risk [Sandy] recanting testimony that was favorable to the Defense." Moreover, Counsel's "general practice [was] to not badger an alleged victim in these types of cases." Lastly, Counsel "testified that he fully discussed the case and his strategies with Richey,"

who, along with Counsel's co-counsel, "agreed with th[e] decision" not to cross-examine Sandy.

¶79    Based on the foregoing, Richey fails to prove that Counsel performed deficiently in choosing not to cross-examine Sandy about the post-assault text messages. When reviewing an ineffective assistance claim, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and we also "reconstruct the circumstances of counsel's challenged conduct . . . from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. For deficient performance purposes, the "question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *State v. Wright*, 2019 UT App 66, ¶ 30, 442 P.3d 1185 (quotation simplified).

¶80    Here, while the text messages certainly could have been used in the manner advocated by Richey, and perhaps a different lawyer would have asked Sandy about them, reasonable counsel could have also decided against doing so. The rule 23B court's findings clearly illustrate that Counsel considered the messages but ultimately decided—in agreement with Richey and co-counsel—that using them would not be beneficial to Richey's case. This was a valid tactical decision given that Counsel believed Sandy "had said everything the Defense needed her to say" and because Counsel "did not want to risk [Sandy] recanting testimony that was favorable to the Defense."

8.    Consensual sexual activity the night of the incident

¶81    Richey argues Counsel rendered ineffective assistance for failing to introduce text messages that "support Richey's account that any sexual intercourse on the night of the alleged incident was consensual." Specifically, he contends Counsel performed deficiently by not introducing certain pre-incident messages that show Sandy was "looking forward to having sexual intercourse with Richey" because these messages were "crucial" for the jury

to determine what happened the night of the incident and they could have impeached Sandy's trial testimony that she was "afraid to have sex with" Richey because he likely gave her herpes.

¶82 This claim was the second issue remanded under rule 23B of the Utah Rules of Appellate Procedure. Because Counsel's decision to not use these text messages did not differ from his decision to not use the messages discussed in the prior section, we conclude that this argument fails for the same reasons as previously articulated. *See supra* ¶¶ 78–80.

¶83 Given Counsel's explanations at the remand hearing, we do not believe that the decision to forgo cross-examining Sandy about her pre-incident texts to Richey was so unreasonable that it constituted deficient performance.

9.     Fear of Richey

¶84 Richey argues Counsel rendered ineffective assistance for failing to present evidence that would have impeached Sandy's trial testimony that she was afraid of Richey.

¶85 After reporting the assault to police, Sandy was interviewed by a detective. The interview was recorded on video and lasted for over two hours. During the interview, Sandy told the detective, "I told you that I was afraid of his background and what he'd do. That's all bull—that's all baloney. . . . I'm not afraid of him. . . . [H]e needs to be taken down." However, at trial, when asked by the State why she did not identify Richey as her assailant when she talked to Nurse, Sandy said, "Because I was afraid of him. He had threatened me many times if I ever crossed him, they'd never find my body." Counsel did not seek to introduce Sandy's video interview with the detective that seemingly contradicted this prior statement.

¶86 Richey contends Counsel performed deficiently by not introducing the video of Sandy's statement that she was not afraid

of Richey, because it would have impeached her trial testimony and undermined her credibility. This claim was the final issue remanded under rule 23B of the Utah Rules of Appellate Procedure. The rule 23B court's findings do not expressly address the video other than to state that (1) a transcript of the portion of the interview identified in the prior paragraph, along with the full video interview, were submitted at the remand hearing; (2) the full video interview was provided to Counsel in discovery; and (3) co-counsel, who was not involved in preparing the case for trial, did not review the discovery and was unaware of the video statement before or during the trial.

¶87    As with Richey's other extra-record claims, we cannot conclude that Counsel performed deficiently by not using Sandy's statements in her police interview at trial. The rule 23B court's findings show that Counsel was aware of the video at the time of the trial. Reasonable counsel could conclude that if questioned, Sandy would explain her statement to the detective in a way that would have both limited the impeachment value and reflected poorly on Richey. Importantly, Richey fails to acknowledge the larger context in which Sandy's statement appeared. Immediately before saying that her fear was "all baloney," Sandy told the detective that she had "been dealing with this idiot for a year and a half" and said, "[W]hen I found out that he was hurting other people, I was done. That's it." Counsel could construe Sandy's "baloney" statement as reflecting that she was willing to overcome her fear of Richey so that he could be "taken down" and no longer "hurt[] other people." Emphasizing this fact would not have helped Richey's case, nor would it have been inconsistent with Sandy's trial testimony.

¶88    Because reasonable counsel could have decided against introducing the video of Sandy's interview at trial, Richey has failed to prove that Counsel performed deficiently.

B.      Prosecutorial Misconduct

¶89    Richey argues Counsel rendered ineffective assistance for failing to object or request a curative instruction after the prosecutor allegedly engaged in misconduct by arguing matters outside the evidence.

¶90    Counsel argued in closing that the charges against Richey were based solely on Sandy's "bald allegation." He posited that Sandy came up with the false "narrative" after Richey did not return to her the morning after the assault. On rebuttal, the prosecutor countered that the lack of "independent witnesses" was due to the nature of the crime: sex crimes "are committed in secrecy." She also asserted that Sandy's text messages illustrated the manner in which Sandy had recalled the events of the night of the incident:

> [T]hese text messages that we provided to you, you could sort of see the progression of [Sandy] realizing what had . . . happened to her.
>
>           . . . .
>
>           As the morning progresses, *because of the trauma* and because of the huge amount of alcohol she was given secretly, *the memories start to come back to her. That's perfectly understandable."*

(Emphasis added.)

¶91    Richey argues the emphasized phrases consist of "'improper factual testimony'" because the prosecutor instructed the jurors as an expert "that trauma prevented [Sandy] from immediately remembering what occurred the night before." (Quoting *State v. Thompson*, 2014 UT App 14, ¶ 64, 318 P.3d 1221.) He asserts that Counsel performed deficiently for not objecting to the prosecutor's statements. We disagree.

¶92 "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (quotation simplified). "Moreover, the failure of defense counsel to object to statements made by a prosecutor during the closing is a matter to which we attach significance. It is not only a sign that what was said sounded less exciting at trial than appellate counsel now would have it seem, but it is also some indication that the tone and manner of the now challenged aspect of the prosecutor's argument were not unfairly prejudicial." *State v. Haynes*, 2025 UT App 75, ¶ 68, 571 P.3d 1197 (quotation simplified), *cert. denied*, Sep. 10, 2025 (No. 20250823).

¶93 Even if we were to agree with Richey that the prosecutor's statement was potentially improper, we fail to conclude that it was *so clearly improper* as to leave Counsel no choice but to object. As detailed above, the prosecutor's statement was made in the larger context of responding to Counsel's argument that Sandy had fabricated the story after Richey did not return to her the morning after the assault. Throughout the trial, testimony was introduced supporting that Sandy remembered "traumatic things" that happened the night of the assault. Counsel could have reasonably concluded that the prosecutor's statement could be understood as suggesting that the only things Sandy could remember from the night of the assault were the traumatic things, rather than "that trauma prevented [Sandy] from immediately remembering." And we must "attach significance" to the possibility that Counsel decided not to object and thereby draw attention to the interpretation that could be deemed improper. *See id.* Given the potential multiple interpretations of the prosecutor's statement and in light of the evidence presented at trial, we conclude that Counsel did not perform deficiently for not objecting to the prosecutor's statement.

C.    Pretext Call

¶94    Richey argues Counsel rendered ineffective assistance in allowing the entire pretext call to be introduced into evidence. Specifically, he contends that Counsel should not have allowed the jury to consider two portions of the call that contained (1) "inadmissible propensity evidence" that Richey had previously filmed Sandy using a "concealed" camera and (2) "irrelevant, unfairly prejudicial evidence" that Richey had engaged in domestic violence and substance abuse. We address each in turn.

1.    Propensity evidence

¶95    Richey asserts that Counsel rendered ineffective assistance for failing to object to a portion of the pretext call where Richey admitted to filming Sandy with a "concealed" camera. He contends that reasonable counsel would have objected to the admission of the evidence under rule 404(b) of the Utah Rules of Evidence and that Counsel's failure to do so prejudiced Richey's defense because, without this evidence, the State had "little to no evidence to convict Richey of either count of voyeurism." This claim fails for lack of deficient performance.

¶96    At the preliminary hearing, the State moved to admit two segments of the fifty-plus minute pretext call: (1) a seventy-five second segment where Sandy confronts Richey about secretly spiking her wine before they engaged in sexual intercourse during their January 2018 date and (2) an approximately five minute segment where Richey admits to secretly spiking Sandy's eggnog with a pint of Everclear on the night of the assault. Counsel objected on the ground that he did not want the statements on the call "selectively edited by the State." He argued that the State had "presented [Richey's statements] as some kind of admission," but when considered in "the context of the entire call," the statements were merely Richey "trying to pacify [Sandy]." Counsel concluded, "[W]e say things for lots of different reasons and . . . [con]text is necessary. . . . I understand

50 minutes is a long time, but, . . . if they're going to present statements as if they're admissions, it has to be in the full context or it's misleading."

¶97 At trial, the pretext call was admitted in its entirety without objection. Included in the middle of the fifty-plus minute call is a two-second admission by Richey that he had filmed Sandy during their January 2018 date with a "concealed" camera during sexual activity. Counsel did not object or otherwise draw attention to this statement. Then, in closing argument, Counsel relied heavily on the pretext call to support the theory that Sandy had made up the allegations against Richey after he did not return to her the morning after the assault. Among other things, he argued that the pretext call showed Sandy "trying to bait" Richey into saying that he had spiked her drink but Richey "clearly doesn't get what she's talking about." Counsel also asserted that the pretext call included statements by Sandy indicating she had consented to sexual intercourse and that, months later, Richey was completely unaware that Sandy had experienced any "traumatic things" on the night in question. And Counsel reiterated that Sandy was "fully engaged" in the sexual activity that night and that Richey was adamant he would never "take advantage of some[one] passed out."

¶98 Now, Richey complains that Counsel should not have allowed the jury to hear that he had previously used a "concealed" camera during sex. Richey contends that the incident he was referring to during the phone call was inadmissible rule 404(b) evidence of a prior wrong or other act because the incident was not the incident recorded in either of the video exhibits the State introduced at trial to support the voyeurism counts. Richey bases this argument on the fact that during the pretext call, he tells Sandy that he recorded her during their January 2018 date with "a cell phone in his hand" but neither video exhibit shows Richey also recording Sandy with a cell phone in his hand.

¶99 Richey's argument fails to account for the entirety of the pretext call. While he is correct that during the pretext call he

initially admits to filming Sandy with his cell phone while they were "making love," he later admits that he filmed "more than just what [he] picked up with [his] phone and recorded." And, having reviewed the video exhibits, we are confident that Richey's subsequent description of the night is consistent with the acts recorded in one of the videos. Given all this, Richey's admission to using a "concealed" camera was not rule 404(b) evidence; rather, it was evidence supporting the charged conduct. Consequently, any motion to exclude the evidence under rule 404(b) would have been futile, so Counsel was not deficient for not moving to exclude it on this basis. *See State v. Broadwater*, 2024 UT App 184, ¶ 35, 562 P.3d 739 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (quotation simplified)), *cert. denied*, 564 P.3d 959 (Utah 2025).

2.      Evidence of domestic violence and substance abuse

¶100   Richey argues that Counsel rendered ineffective assistance "for seeking to admit rather than exclude" a portion of the pretext call where Sandy alleged that Richey had yelled at his ex-girlfriend's family members, abused pills, hit her on her back, and "joked" when she confronted him about bruising her breast. Unlike Richey's admission to using a concealed camera—which happened in the middle of the call—this exchange occurred at the end of the call. Richey contends Counsel performed deficiently by not moving to exclude the statements under rules 402, 403, and 404(b) of the Utah Rules of Evidence. He further contends that he was prejudiced by Counsel's failure because "the outcome of the trial was a credibility determination" and "the jury's knowledge of Richey's alleged domestic violence and substance abuse undermined his credibility." We need not consider whether Counsel performed deficiently in electing to not end the pretext call before Sandy's allegations because Richey cannot establish that he was prejudiced by Counsel's decision.

¶101 "The demonstration of prejudice must be a demonstrable reality, not simply a speculative matter." *State v. Bermejo*, 2020 UT App 142, ¶ 23, 476 P.3d 148 (quotation simplified). "While we appreciate that the jury's knowledge of a defendant's history of domestic violence *can* undermine the defendant's credibility," *State v. Gonzalez*, 2021 UT App 135, ¶ 11, 501 P.3d 1205 (emphasis added), Richey has pointed to nothing indicating that such was the case here. Indeed, his entire argument on this point is limited to the bald assertion that the jury's knowledge of the alleged domestic violence necessarily undermined his credibility. But we fail to see how the statements with which Richey takes issue "would have undermined his credibility any more than the inferences the jurors likely made (or at least could have reasonably made) by virtue of the fact that they participated in a trial" where some of the charges at issue (object rape and forcible sodomy) were much more severe than the alleged domestic abuse. *See id.* This point is underscored by the fact that the entire abuse allegation consisted of Sandy stating that Richey yelled at his ex-girlfriend's family members, "hit" her on her back, and joked about a time he "grabbed" her breast. This evidence is neither "graphic" nor "arresting," *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999), and, even if true, it pales in comparison to the charged conduct.

¶102 Lastly, when considered along with the other evidence presented at trial, we think it unlikely that excluding Sandy's statements would have changed the evidentiary picture in a meaningful way for two reasons. First, the pretext call was over fifty minutes long. Sandy's allegation, and Richey's response, were "fleeting, and the State did not emphasize or mention [them] during the remainder of the proceedings." *Bermejo*, 2020 UT App 142, ¶ 40; *see also State v. Nunes*, 2020 UT App 145, ¶ 23, 476 P.3d 172 (finding no prejudice where the witness's improper testimony "was relatively isolated"). Second, as specifically concerning the substance abuse allegation, the pretext call was merely cumulative of Sandy's trial testimony. *See State v. Jones*, 2020 UT App 31, ¶ 35, 462 P.3d 372 ("[W]here testimony is merely cumulative, we are disinclined to find prejudice even when the

testimony was improperly admitted."). On direct examination, Sandy testified that she suspected she was drugged on the night of the assault because "Richey had Ambien and Xanax at his availability and he would use those sometimes to overdo." Counsel did not object to this testimony. Thus, because the allegation of substance abuse in the pretext call did not offer anything "new or additional" to the evidentiary picture, Richey was not prejudiced by its admission. *State v. Thomas*, 777 P.2d 445, 450 (Utah 1989).[4]

CONCLUSION

Richey has not established that he received constitutionally ineffective assistance of counsel in any of the manners he asserts. We accordingly affirm his convictions.

––––––––––

4. Richey also asks us to reverse under the cumulative error doctrine. Under the cumulative error doctrine, we will reverse "only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (quotation simplified). We have not identified any errors in this case, and for the one claim where we have assumed error, we conclude that such error had no potential for harm. *See State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892. Consequently, the cumulative error doctrine does not apply. *See id.* (stating that the cumulative error doctrine has no application where "the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm" (quotation simplified)).